(Reap. Dec. 10338)

KURT ORBAN COMPANY, INCORPORATED *v.* UNITED STATES

Entry Nos. 955170; 745859.

(Decided September 20, 1962)

*Sharretts, Paley & Carter* (*Eugene F. Blauvelt* of counsel) for the plaintiff.
*Joseph D. Guilfoyle*, Acting Assistant Attorney General (*Morris Braverman*, trial attorney), for the defendant.

LAWRENCE, Judge: The above two appeals for a reappraisement, which were consolidated for the purpose of this proceeding, relate to importations of iron or steel wire, manufactured in France and exported to the United States through the port of Antwerp, Belgium, during August 1959 and February 1960.

The merchandise was appraised on the basis of export value, as that value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956 (19 U.S.C. § 1401a(b)), and it is agreed between the parties to this action that said export value is the proper basis of appraisement.

Plaintiff claims that the invoice unit values correctly represent export value. Further, plaintiff contends that the appraiser adopted the invoice unit ex-factory price, in United States currency, the appraisement being expressed in the following language, "At invoice units net packed plus item X."

Item X in reappraisement R61/1342 reads, "Inland freight and FOB Charges $8 x 15 T. 660 . . . $125.28."

In reappraisement R61/5194, item X reads, "Inland freight and FOB Charges $11 x 2 T. 724=$29.96."

The inland freight and f.o.b. charges in each instance were added as a single item to the total invoice amount.

Accepting the invoice unit price as the proper basis for appraisement, plaintiff attacks only the addition of the items X, above referred to. That the appraisement is severable is supported by respectable authority, and plaintiff is permitted to rely upon the presumption of correctness of all elements entering into the appraisement, leaving only the question whether the inland freight and f.o.b. charges were properly added to make export value. *United States* v. *Fritzsche Bros., Inc.*, 35 C.C.P.A. (Customs) 60, C.A.D. 371.

Section 402(b) of the Tariff Act of 1930, as amended, *supra:*

EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

As the case is presented for determination, the sole question in issue is whether or not the appraiser was justified in adding to the invoice unit values the amount of inland freight and f.o.b. charges above indicated.

In support of its claim that the appraiser improperly added "Item X" in each case, plaintiff introduced the affidavit (plaintiff's exhibit 1) of Marcel Seidler, managing director of Société Anonyme pour L' Exploitation de Tréfileries (SAPET), who had been associated with that company for 11 years. He stated that "The business of SAPET is in part the sale of wire and other products" as agent for 10 manufacturers, whose names are set forth in the affidavit, and other mills manufacturing similar products. The manufacturers are located in various parts of France, but sales and offers for sales of the merchandise for exportation to the United States are made in Paris.

SAPET is owned by the principal mills for which it acts as export sales agent.

For the past 10 years, Seidler and other employees of SAPET acting under his direct supervision and control have offered for sale and sold various kinds of wire for the account of the mills manufacturing it.

No sales became final until they had been accepted by the particular manufacturer at his factory. All prices quoted and sales made of the merchandise are ex-factory.

The affidavit of Seidler is very comprehensive and informative, and it is difficult to abbreviate it without omitting relevant facts.

It seems that when a sale is made the manufacturer makes out an invoice, which shows the ex-factory price as well as a total price for the shipment, which is forwarded to SAPET. SAPET then prepares an invoice to the American purchaser showing the same prices, description of the merchandise, and the total ex-factory amount as appear on the manufacturer's invoice. On its invoice, SAPET shows an amount for inland freight and the f.o.b. charges based upon a fixed rate per metric ton.

The affidavit identifies the two shipments in controversy here, gives the manufacturers' names, and states that all the unit prices shown on SAPET invoices were ex-factory, and also shows that a separate charge was made for inland freight and f.o.b. charges in one shipment at $11 per metric ton, while in the other shipment it was $8 per metric ton. In each instance, the purchase order was accepted by the manufacturer at his home office, the prices agreed upon being ex-factory.

Affiant states that—

* * * the manufacturer had no interest in or responsibility for the goods after the goods left the factory. The interest in and responsibility for transporting the goods from the factory to the United States was solely that of the purchaser, Kurt Orban Company. * * *

It is the custom of SAPET to arrange and pay for transportation of merchandise from the factory to the port of embarkation as well as for loading the merchandise on shipboard.

While it was possible for the plaintiff or any other customer to pay for the transportation of the goods from the factory without the intervention of SAPET, most customers prefer to have SAPET handle the transportation to seaport as a matter of convenience, but in no case was any amount in excess of the ex-factory price remitted to the manufacturer. In other words, the manufacturer of the merchandise does not receive any part of the charges made for transportation and loading. The purchaser's obligation to the manufacturer is fully satisfied by remittance of the ex-factory price shown on the invoice. Furthermore, the purchaser insures the goods from the time they leave the factory and assumes the risk of loss or damage to the merchandise.

The testimony of plaintiff's witness, Andrew B. Ross, manager of the wire department of Kurt Orban Company, Incorporated, plaintiff herein, and who supervises all purchases and sales of steel wire, corroborates the statement of Seidler on many counts.

He confirmed the statement of Seidler that the wire under consideration was insured by Kurt Orban Company, Incorporated, from the factory in France to the United States.

Ross had visited the Paris office of SAPET, was acquainted with Marcel Seidler, and had visited four of the mills represented by SAPET. He had made a purchase at one of SAPET's mills, Hadir, located in the SAAR region, f.o.b. the mill, and the transportation from the mill to seaport was arranged by freight forwarders in Antwerp, known as SALF.

Ross also testified to the great convenience to a purchaser, such as Kurt Orban, to have SAPET or SALF arrange to transport its purchases from mill to seaport.

Ross explained the procedure followed by Kurt Orban in ordering merchandise through SAPET—

* * * I evaluate the material for its specific tensile, galvanization requirement. Then I decide where we should place such an order. If I decide on one of the SAPET mills then I telex this information to SAPET, and ask SAPET to give me a specific offer from a specific SAPET mill. In no case do I leave it to SAPET to arbitrarily book such an order with any of their mills without my specific knowledge where the order is booked.

Ross testified that orders for wire were placed f.o.b. the mill, but that prices were generally quoted f.o.b. port.

Defendant introduced a purchase order of the Kurt Orban Company, Incorporated, for the merchandise covered by reappraisement R61/1342, which was marked defendant's exhibit A.

It clearly appears from the record that the appraisements in each case were made at invoice unit prices, net, packed, which were, in fact,

ex-factory prices expressed in United States currency. In each case, the inland freight and f.o.b. charges were added as a single item to the total invoice amount.

The record amply supports plaintiff's contention that the invoice unit prices, ex-factory, represent the statutory export value and that the addition of the items specified as inland freight and f.o.b. charges were improperly added to make export value. *United States* v. *Gitkin Co.*, 46 Cust. Ct. 788, A.R.D. 132.

Seidler, in his affidavit, stated that "Sales and offers for sale for exportation to the United States are made in Paris by SAPET" and that "All prices quoted and sales made are at an ex-factory price for the merchandise." Consequently, it would appear that the factories of the sellers are the principal markets for the merchandise in controversy. *United States* v. *Gitkin Co.*, 46 Cust Ct. 788, A.R.D. 132.

The evidence introduced by plaintiff stands unrefuted.

The court, accordingly, finds as facts:

1. The merchandise to which these appeals relate consists of iron or steel wire, which was exported from France after the effective date of the Customs Simplification Act of 1956 (February 27, 1956), and was not enumerated in the "official final list" published in T.D. 54521.

2. Said merchandise was shipped from the manufacturers' mills in France to Antwerp, Belgium, and then transported by ship to the United States.

3. Said merchandise was invoiced and entered at the ex-factory prices, including packing.

4. Said merchandise was appraised at invoice unit prices with an addition for inland freight and f.o.b. charges set forth on the invoices.

5. The purchase of said merchandise was negotiated through the manufacturers' selling agency, known as SAPET, whose office is located in Paris, France, the acceptance of the offer in each instance being made by the individual manufacturer at his mill.

6. At, and prior to, the dates of exportation herein, the factories of the sellers were the principal markets for the sales of the imported merchandise.

7. At, and prior to, the dates of exportation herein, said manufacturers freely sold said merchandise for exportation to the United States at the ex-factory unit prices shown on the invoices.

As conclusions of law, the court holds:

1. Export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper statutory basis for the determination of the value of the merchandise herein.

2. The export value of the subject merchandise is the invoice unit values, net, packed, exclusive of item X, in each case.

Judgment will issue accordingly.