(A.R.D. 163)

UNITED STATES v. KURT ORBAN COMPANY, INCORPORATED

Entry Nos. 955170; 745859.

Third Division, Appellate Term

(Decided December 5, 1963)

*John W. Douglas,* Assistant Attorney General (*Daniel I. Auster* and *Morris Braverman,* trial attorneys), for the appellant.

*Sharretts, Paley & Carter* (*Eugene F. Blauvelt* of counsel) for the appellee.

DONLON, Judge: Defendant below has appealed from the reappraisement decision of the trial judge in two consolidated cases. *Kurt Orban Company, Incorporated* v. *United States*, 49 Cust. Ct. 392, Reap. Dec. 10338. Appellant alleges as error, *inter alia*, the finding below (by amended decision) that the principal markets for sale of the imported merchandise were the factories of the respective manufacturers. Appellant argues that there is no probative evidence to support such finding.

Appellant's contention is that plaintiff below failed to make a *prima facie* case and that judgment, therefore, should be entered affirming the appraised values.

The merchandise in issue consists of iron or steel wire, manufactured in France, sold to the plaintiff by the manufacturers' agent in Paris, and exported to the United States through the port of Antwerp, in Belgium, in the months of August 1959 (R61/5194) and February 1960 (R61/1342).

Findings below which are accepted as correct and, hence, are not matter for our review, are that this merchandise is an item that is not enumerated in the final list, T.D. 54521, and since it was imported subsequent to February 27, 1958, it is to be valued under the new law; and that export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is, on the facts of record, the appropriate statutory basis of appraisement.

The merchandise was entered at a value which reflected deduction of a sum alleged to represent inland freight from the factories, plus other f.o.b. charges Antwerp, and which was so described on the invoices where it appeared as an added item billed to plaintiff. The appraiser increased entered value by such charge. Appellant contends that such addition is proper or, at the least, that appellee has not overcome the presumption that the appraisement was correct. Appellee argues that the trial judge correctly found such addition to be improper, and that his finding should be affirmed.

There are few issues which have been as extensively litigated in reappraisement appeals in recent years, as the issue of when inland freight and f.o.b. charges are, and when they are not, to be reflected in export value. Since the leading cases on this issue arose under the old law, so-called, as it read prior to amendment by the Customs Simplification Act of 1956, it is relevant to consider not only what the rule is, as laid down in such cases, but also whether and to what extent, if any, the provisions of the amended law, here applicable, may require a different result.

In *United States* v. *Paul A. Straub & Co., Inc.*, 41 CCPA 209, C.A.D. 553, the issue concerned inland freight costs from the principal

market, in Germany, to the port of exportation, which was Bremen, also in Germany. The trial judge held that such costs, the so-called inland freight from factory to Bremen, did not form part of export value, and that the appraiser had incorrectly refused to deduct the inland freight cost from invoice unit prices. The appellate division affirmed. Our appeals court, however, reversed this decision, holding that, on the facts of the case, inland freight was part of export value, as the appraiser had held, and that it was not to be deducted from invoice unit price.

The facts in the *Straub* case included the fact that all sales or offers for sale of the merchandise were made at the factory in Selb-Stadt, which was held to be the principal market, and that the merchandise was priced f.o.b. Bremen. No sales or offers for sale were found to have been made on an ex-factory basis. Hence, on the facts there before the court, price in the principal market included freight costs between the market and Bremen, which was the port of exportation.

As subsequently interpreted, the salient holding of the *Straub* decision was that, in computing export value, the determining factors are, first, the situs of the principal market and, second, the price at which such or similar merchandise is freely offered to all buyers in that market, for export to the United States. If price in the principal market includes inland freight, price is not to be reduced by the cost of such freight in computing export value. If price in the principal market does not include inland freight, then the cost of such freight is not to be added to price.

As in most controversial issues, this is a rule more easily stated than applied. Facts are often dissimilar, in significant respects, to the facts of the *Straub* case.

While there are important language differences between section 402a(d), under which the *Straub* case was decided, and new section 402(b), which we are here called upon to construe, it is our opinion that, as respects the issue of inland freight, such language changes have no real significance. The respective provisions are as follows:

[Section 402a(d).]

(d) The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

[Section 402(b).]

(b) For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the

merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

Under the new statutory provision, as under the old, the first question to be decided is, where is the principal market; and the second question is, what was the freely offered price *in that market*.

On the issue of where the principal market was for this merchandise, the record is not as clear as one might wish it to be. Although appellee contends that the "factories" where the wire was manufactured were the principal markets, and the trial judge so held in his amended order (initially he had held that Paris was the principal market), the record is barren of evidence clearly identifying the situs of these factories. All we have on that point is an affidavit of Mr. Marcel Seidler, managing director of SAPET (which sold the merchandise), in which he states that the factories are located in the provinces of Oise and Marne, in France.

Does the record support the finding that unspecified locations of factories in those two provinces are the situs of the principal markets? In our opinion, it does not.

The evidence before us is more persuasive that the principal market is Paris, as the trial judge first found.

Mr. Marcel Seidler's affidavit, subscribed and sworn to before the vice consul of the United States at Paris, France, on December 29, 1961 (exhibit 1), states that SAPET is a Paris firm which sells wire and other products as exclusive sales agent for the six manufacturing mills which own SAPET, including one of the mills here involved, manufacturer of the merchandise in R61/5194. He further states that SAPET also acts as nonexclusive sales agent for other mills manufacturing wire products, including the manufacturer of the merchandise in R61/1342.

Sales and offers to sell merchandise, in both cases, for export to the United States are made by SAPET in Paris, but sales are not final until accepted by the manufacturer at the factory. Mr. Seidler states that prices are quoted ex-factory; that the manufacturer bills ex-factory, but that this bill is sent to SAPET and not to the buyer. SAPET then prepares its own invoice to the purchaser, which is the same as the manufacturer's invoice to SAPET, except that SAPET adds an amount for inland freight and f.o.b. charges. In appeal 61/5194, as to the mill which is owner of SAPET, the inland freight and f.o.b. charge was $11 per metric ton. In appeal 61/1342, as to the mill which is not an owner of SAPET, the charge was $8 per metric

ton. Although Kurt Orban Company, the United States buyer, was responsible for merchandise on shipment from the factory en route to the United States, and insured the merchandise when it left factory, SAPET customarily arranged for and paid the inland freight and f.o.b. charges "as a convenience to United States purchasers * * *." (Exhibit 1, page 5.)

It is significant, in considering the testimony of Mr. Seidler's affidavit, that the inland freight and f.o.b. charges were separately invoiced to Kurt Orban Company for each shipment and that differences in actual freight charges, because of the location of mill or port in France, in Belgium, or in the Netherlands, or in loading charges, were disregarded. There was a fixed charge, presumably on a theory that actual freight and loading charges would equalize out over a period of time and for all purchasers, although not necessarily as to any particular purchaser. Thus, from January 1, 1957, through October 31, 1957, the charge was $8 per metric ton, regardless of factory situs, or port, or purchaser. When this proved low, SAPET sought to recoup its losses by raising the charge to $11 per metric ton on November 1, 1957, and this rate was continued to October 1, 1959. On the latter date, SAPET reduced the fixed charge again to $8 per metric ton because, by that time, earlier freight losses had been recouped. On April 1, 1961, the fixed charge was increased, this time to $9.75 per metric ton, save on shipments from Bourbourg (it is not clear whether this is the situs of one of the factories of this appeal), and as to such shipments the charge was then reduced to $7 per metric ton. While SAPET arranged for and paid actual inland freight and f.o.b. charges from factory to port, *"it has always been possible for any purchaser,"* including Kurt Orban Company, to take delivery of the merchandise at the factory and arrange and pay for the transportation and loading of the merchandise directly." (Affidavit, page 6, emphasis added.)

Choice of shipping port was chiefly dependent on availability of shipping space on a required date. The port might be inside France or outside France, "but the fixed charge of either $8.00 or $11.00 per metric ton" would remain the same, irrespective of situs of the port and whether in or out of France. (Affidavit, page 7.) By taking a flat rate ($8 or $11 per metric ton) for inland freight and f.o.b. charges, SAPET could bill for these charges when it billed for the merchandise, and since billings were usually prepared prior to the time when such charges were actually incurred, and thus before the amount of the charge was known to SAPET, this was a convenient arrangement. SAPET never looked for a profit in fixing such charges, according to Mr. Seidler, and adjusted the charges from time to time, as above noted. The fixed charge added for inland freight, Mr. Seidler says, is not related to ex-factory price or to changes in the ex-

factory price of the merchandise. Although the purchaser pays SAPET the total invoice charge, SAPET remits to the manufacturer only the ex-factory price.

Mr. Andrew B. Ross, manager of the Kurt Orban Company wire department, testified. At the time of trial, he had been working for Kurt Orban Company about 4½ years. For 1 year, starting in December 1960, he was manager of the wire department, supervising purchases and sales of steel wire. He said that he continued the regular practices of his predecessor in purchasing from SAPET wire manufactured in France. He had visited the offices of SAPET in Paris, and knew Mr. Marcel Seidler, manager of the SAPET office in Paris. He had occasion to visit four of the wire mills whose products SAPET sold.

Mr. Ross stated that, when he took over in December 1960 as manager of the wire department, the practice he found and followed was to allocate an order for wire to the mill which could best deliver a product meeting specifications. If that was a mill in France represented by SAPET, he would request SAPET to get an offering price for the wire. If the price quoted was satisfactory, he would place the order with SAPET for that mill. The base point of price offerings made through SAPET was generally f.o.b. port, but he had also purchased f.o.b. mill.

In all purchases from SAPET, Kurt Orban Company made certain to insure the merchandise from the time it left the mill until it reached the place of delivery in the United States, and this was done as to the wire of these appeals. Kurt Orban Company did not usually attempt to arrange for transportation from mill in France to port in Belgium, because it was not convenient or feasible to do so.

On cross-examination, Mr. Ross identified Kurt Orban Company purchase order No. 25343, dated October 22, 1959, to SAPET, for "wire to be produced by Pernin" at prices listed net per metric ton, f.o.b. mill plus $8 per metric ton for f.o.b. seaport delivery. (Exhibit A.) The official papers in evidence confirm that this is the purchase order for the merchandise of reappraisement R61/1342. Mr. Ross stated that the Kurt Orban Company order did not indicate what mill was the supplier, since the "order * * * is still placed with SAPET as far as I know, regardless of what mill will produce it." (R. 33.)

When asked how SAPET knew which mill was to get a particular order, if that was not noted on the Kurt Orban Company purchase order, Mr. Ross said that the mill was identified in separate correspondence and that, ordinarily, the name of the supplying mill does not appear on purchase orders sent to SAPET. When asked, on cross-examination, what he meant in his direct testimony when he said the basic point was the f.o.b. point, he stated that "the prices are ordinarily f.o.b. port." (R. 36, 38.)

Together with certain invoices and other matter received as exhibits, and the official papers, this is the substance of the record before us. The situs of the principal market is an issue of fact.

The cases lay down the guidelines by which situs of the principal market is to be determined. It is the place where sales are made. *John A. Steer & Co.* v. *United States*, 30 Cust. Ct. 504, Reap. Dec. 8196. A market is the place where merchandise is freely offered for sale, as distinguished from a place where it is manufactured or a place where it is delivered. *Mary G. Ricks* v. *United States*, 29 Cust. Ct. 517, Reap. Dec. 8187.

What does the record show? We find it supports the trial judge's initial finding that Paris was the principal market for this merchandise. Plaintiff and, so far as appears, all other buyers, negotiated with SAPET in Paris. There is no record of any negotiations by buyers direct with the factory or factories, or of offers by the factories to buyers. Moreover, the factories billed SAPET in Paris, and SAPET in Paris, in turn, billed the buyers. Paris was the place where this merchandise was offered for sale and where it was sold.

Next, what was the price in Paris, the principal market? We find it was the price at which SAPET billed the merchandise, a price which included an arbitrary sum that was not necessarily the actual cost of inland freight and f.o.b. charges. In the case of appeal R61/5194, such arbitrary sum was $11 per metric ton. In the case of appeal R61/1342, such arbitrary sum was $8 per metric ton. These charges were added to an ex-factory charge, in order to arrive at the total invoiced amount. Nothing is to be subtracted from such invoice charge in computing export value, for these are the prices at which the merchandise was sold in the principal market, a price f.o.b. port, as Mr. Ross testified. *United States* v. *Paul A. Straub & Co., Inc., supra.*

It will be noted that the port of shipment of this merchandise is a port outside the country of exportation, which raises an issue not necessary for us to consider in view of our decision. Nor need we consider the failure of proof as to where the factories are which appellee claims are the principal markets.

We find as facts:

1. That SAPET is a manufacturers' agent, located in Paris, France, for the sale of wire and other products produced by factories located in various parts of France.

2. That the merchandise of these appeals consists of iron or steel wire produced by factories at locations in France and that, at the times of exportation, such wire was freely sold and offered for sale by SAPET in Paris for export to the United States.

3. That the merchandise was shipped from factories in France to

Antwerp, Belgium, for export to the United States, pursuant to orders placed by plaintiff with SAPET in Paris.

4. That the merchandise was exported to the United States after February 27, 1958, the effective date of the Customs Simplification Act of 1956, T.D. 54165, and is not an item on the final list published by the Secretary of the Treasury, T.D. 54521.

5. That the factories prepared and forwarded a factory invoice to SAPET showing the ex-factory prices per metric ton for the merchandise.

6. That SAPET prepared a seller's invoice to the purchaser showing the ex-factory price per metric ton with a fixed charge characterized as inland freight and f.o.b. charges to Antwerp, which charge was $11 per metric ton for R61/5194 and $8 per metric ton for R61/1342, in both instances added as a single item to the ex-factory price, without regard to the situs of the factory or the actual cost of such charges.

7. That, at the time of exportation, Paris was the principal market for the sale of the merchandise, and the merchandise was sold f.o.b. Antwerp.

8. That the merchandise was appraised at the SAPET ex-factory invoice prices per metric ton, plus the fixed inland freight and f.o.b. charges per metric ton, as invoiced to buyer.

We conclude as a matter of law:

1. That export value, as that value is defined in section 402(b) of the Tariff Act of 1930, as amended, is the proper basis for determining the value of the merchandise of these appeals.

2. That such export values are the appraised values.

Judgment will enter accordingly.