(Reap. Dec. 10866)

TAPETES LUXOR, S.A., ET AL. V. UNITED STATES

Entry No. 1128, etc.

(Decided December 7, 1964)

*Leon Herzfeld* and *Sharretts, Paley & Carter* (*Eugene F. Blauvelt* of counsel) for the plaintiffs.

*John W. Douglas*, Assistant Attorney General (*Morris Braverman*, trial attorney), for the defendant.

WILSON, Judge: The merchandise involved in these cases, consolidated at the trial, consists of wool hooked rugs, manufactured in Mexico and exported to the United States through the port of Laredo, Tex. The dates of exportation range from July 26, 1956, through February 27, 1959.

The merchandise exported prior to February 27, 1958, was appraised on the basis of cost of production, as that value is defined in section 402(f) of the Tariff Act of 1930, and the merchandise exported after that date was appraised on the basis of export value, as that value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956. In all instances at issue the appraisement was made at an amount equivalent to the invoice unit price in Mexican currency, plus 5 percent. The plaintiffs agree that the respective bases of appraisement are correct and attack only the addition made by the appraiser of 5 percent.

The pertinent provisions of the tariff act are as follows:

Sec. 402.  Value.  [Tariff Act of 1930]

\*   \*   \*   \*   \*   \*   \*

(f) Cost of Production.—For the purpose of this title the cost of production of imported merchandise shall be the sum of—

(1) The cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing such or similar merchandise, at a time preceding the date of exportation of the particular merchandise under consideration which would ordinarily permit the manufacture or production of the particular merchandise under consideration in the usual course of business;

(2) The usual general expenses (not less than 10 per centum of such cost) in the case of such or similar merchandise;

(3) The cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the particular merchandise under consideration in condition, packed ready for shipment to the United States; and

(4) An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraphs (1) and (2) of this subdivision) equal to the profit which ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the production or manufacture of merchandise of the same class or kind.

Sec. 402.  Value.  [Customs Simplification Act of 1956]

\*   \*   \*   \*   \*   \*   \*

(b) Export Value.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

The merchandise in these cases was entered at the port of Laredo by El Bordador, S. de R.L. (R59/8198) or Tapetes Luxor, S.A., as the importer of record. The declaration of seller or shipper on the consular invoice is in the name of Export Shipping Office, S.A., designated as the shipper. El Bordador or Tapetes Luxor is designated as the seller and an American firm as the purchaser.

In the earliest shipments, covered by R59/8198, the official papers include commercial invoices from El Bordador to the American purchaser in U.S. currency, f.o.b. Laredo, Tex., less 10 percent discount. Unit prices included a 5 percent commission to Export Shipping Office.

Later shipments contain invoices from Tapetes Luxor to the American purchaser giving the price in pesos, f.o.b. Texcoco, Mexico. A

typical packing list, in the name of Export Shipping Office, contains the following:

We are the shippers acting as agents for the sellers and the buyers. This merchandise is being shipped for the account of the sellers at a commission of 5% which amount is shown on the expense list below:

In some shipments the 5 percent was designated as a handling charge or a documentation charge.

Plaintiffs claim that the 5 percent commission or charge was not a profit or charge which inured to the benefit of the seller or manufacturer, but was paid to Export Shipping Office for services rendered on behalf of the purchaser for handling the transportation of the merchandise from Mexico City to Laredo and for arranging and advancing transportation charges, insurance, and customs duties and clearance. It is contended that it is not a part of the value of the merchandise.

In support of this claim, plaintiffs introduced into evidence the affidavit of Francis P. Maher, who was the Texas' representative of El Bordador, S. de R.L. (predecessor to Tapetes Luxor) in 1956. He stated that in the course of a series of conferences held with customs officials a net f.o.b. Laredo price was arrived at by adding certain expense items to the f.o.b. Texcoco price and that among the items agreed to be nondutiable was a charge made by Export Shipping.

However, the appraiser of merchandise at Laredo, Mr. Gabriel Ornes, testified at the trial that the 5 percent commission was treated as overhead or profit and was considered a part of the value of the merchandise, as it was a *bona fide* service of the company to their customers.

The resolution of the issue presented involves the method of doing business of the Mexican manufacturer and the relationship between it and Export Shipping Office, S.A.

The record establishes that the three corporations involved, El Bordador and Tapetes Luxor, manufacturers, and Export Shipping, forwarders, belonged to the so-called Salle group, and that the principal stockholder of all of them was Michael Salle. El Bordador had been formed in 1943, for the manufacture and sale of carpet both domestically and for export. It was liquidated in 1956 and its business continued by Tapetes Luxor. Export Shipping Office, S. A., had been formed by Mr. Salle in 1956 to take over the business of Export Shipping Office, S. de R. L., a forwarding company. The same general manager supervised and directed the operation of all the companies. There was a very close association between the manufacturing companies and Export Shipping. While Export Shipping did not occupy any space in the Tapetes Luxor plant in Texcoco, Tapetes Luxor had

an office in the Export Shipping building in Mexico City, at which the general manager worked. Some of the employees worked for all of the companies. Although the companies may have been separate legal entities and kept separate books and records, in actual function they appear to be divisions of one operation controlled by Mr. Salle.

A former general manager, Rene Enriquez, stated that the relationship between the companies was so integrated that it was difficult to believe that they were different companies and that employees of Export Shipping were used by Tapetes Luxor and El Bordador interchangeably. In his opinion, the reason for the operation of Export Shipping was only to save a portion of the duty to be paid to the United States customs. He never thought this operation was illegal, knowing that if El Bordador or Tapetes Luxor utilized any shipping company in Mexico they would have to pay a commission to it for handling the shipments. While two invoices were sent to the customer, one showing the f.o.b. Texcoco price and the other the f.o.b. Laredo price, only the former was sent to the customs broker and the United States customs officials, because the affiant was afraid that duty would be assessed on the f.o.b. Laredo price.

The manufacturer did business with United States purchasers through exclusive distributors for certain sections of the country. Where contracts were made, they provided typically that sales prices would be fixed by Tapetes Luxor; that orders would be sent to Tapetes Luxor for acceptance; that Tapetes Luxor would invoice the merchandise at the official price list, less a discount on the f.o.b. Laredo prices; that this discount represented the importer's commission.

Export Shipping was involved with the merchandise from the inception of the orders. The orders went to it first; it received copies of mill orders and was advised when the merchandise was ready for shipment. The merchandise and the invoices and packing slips prepared by Tapetes Luxor were then sent to Export Shipping. Export Shipping prepared a "Debit Note" giving the costs for import duties, freight, clearance, insurance, and its 5 percent commission, and the Tapetes Luxor invoice price. Insurance coverage to Laredo was taken out for the account of Tapetes Luxor. The customer made his check for the total cost as reflected on the Export Shipping invoice payable either to Export Shipping or the seller. In any case it was deposited to the account of Export Shipping which then paid the seller the amount of the original invoice.

Pricelists were issued with f.o.b. Texcoco prices, in pesos, and f.o.b. Laredo prices, in dollars, and there are statements that the merchandise could have been purchased at the f.o.b. Texcoco (ex-factory) prices without the payment of the 5 percent commission. There are also statements that the f.o.b. Texcoco prices were resorted to when ship-

ments were made by air.   However, no evidence, documentary or otherwise, was presented showing an actual sale f.o.b. Texcoco with the prices paid for the merchandise and an itemization of the additional charges for forwarding and to whom and in what manner they were paid.   The evidence given by Murray Schwartz, a customer of El Bordador and Tapetes Luxor, as to shipments by air was vague, but indicated that a 5 percent charge was paid to Export Shipping. Defendant's collective exhibit E refers to a sale of merchandise shipped by air to Los Angeles, in which the invoices showed f.o.b. Texcoco prices, but the importer paid the air freight and a 5 percent commission to Export Shipping.   There are some statements by purchasers that they could have purchased and obtained delivery in Mexico without the use of or payment of 5 percent to Export Shipping, but there is no evidence of any such sale.   Michael Sullivan, a distributor, testified that he sold invariably on an f.o.b. Laredo basis, since his customers were interested only in that price.   He did not circulate the f.o.b. Texcoco pricelist among prospective customers, but told dealers they could buy that way and ship by air to New York.   He did not tell his customers of the existence of Export Shipping Office and did not know what its function was.

There is a statement that the predecessor to Export Shipping represented customers of El Bordador and other Mexican companies, but there is no evidence that Export Shipping ever acted for anyone other than El Bordador or Tapetes Luxor.   There is nothing in the record to show that Export Shipping was ever sought out independently by a purchaser and retained to handle a shipment for it.   Most of the purchasers who testified or furnished affidavits stated that they did not know anything about Export Shipping and had not engaged its services.   Others said that they had asked Tapetes Luxor to advise them of a forwarding agent.

The entire record is replete with evidence that the manufacturer's method of doing business was actually not to sell f.o.b. Texcoco or at f.o.b. Texcoco prices.   Sales were primarily f.o.b. Laredo.   The invoices in the earliest shipments give an f.o.b. Laredo price.   Entries in all cases were in the name of the manufacturer.   Insurance and shipments were for the account of the manufacturer.   The merchandise was offered at f.o.b. Laredo prices to American customers because it was believed that they would perfer not to have to make their own arrangements for shipping the merchandise from the mill to Laredo. That this was the case is evident from the testimony of Mr. Sullivan and Mr. Karan.   It is clear, therefore, that this method of doing business was adopted by the manufacturer in order to attract customers and that it was part of its selling policy.   If Export Shipping is regarded as a separate entity from the manufacturer, the 5 percent

charge paid to it by the manufacturer was for handling the merchandise for the manufacturer and such charge was included in the price to the customer.

As had been noted, the merchandise exported prior to February 27, 1958, was appraised on the basis of cost of production and the merchandise exported thereafter on the basis of export value. As to the former, plaintiffs claim that the 5 percent charge or commission is not properly a part of cost of production because it was for services rendered after the merchandise was manufactured and packed ready for shipment to the United States. Defendant contends, however, that it represents a charge for services usually performed by a department of the manufacturer and was part of the overhead or profit of the manufacturer.

Plaintiffs rely upon *United States* v. *Alfred Dunhill of London, Inc.*, 32 CCPA 187, C.A.D. 305. The question in that case was whether a certain British purchase tax was part of cost of production, where sales made to a registered dealer (a wholesaler or manufacturer) were not chargeable with the tax. The court held it was not part of the "usual general expenses" and stated (p. 189):

> In our opinion the "usual general expenses" of a business are the expenses of doing business. This would include in addition to the cost and manipulation of materials, all salaries, wages and commissions, traveling expenses, advertising, rents, taxes on buildings, stationery, stenographic, telephone and telegraph expenses, costs of delivery, depreciation on plant and equipment, and other actual outlays. These are the usual general expenses of business, and profit is calculated on the difference between such expenses and receipts.

In *C. J. Tower & Sons* v. *United States*, 44 Cust. Ct. 532, Reap. Dec. 9579, it was held that the expenses of offering the goods for sale, including traveling expenses in connection with the sale, advertising, and selling commissions paid by the manufacturer or producer, were properly part of the usual general expenses within the meaning of the cost of production statute. This decision was reversed by the appellate division (*United States* v. *C. J. Tower & Sons*, 48 Cust. Ct. 683, A.R.D. 139), and re-reversed and remanded by the court of appeals. *C. J. Tower & Sons* v. *United States*, 50 CCPA 76, C.A.D. 824. In the decision on remand (*United States* v. *C. J. Tower & Sons*, 52 Cust. Ct. 636, A.R.D. 172), the court held that advertising costs paid by the manufacturer, whether in trade publications or in magazines directed toward the ultimate consumer, were properly included in the usual general expenses, since the advertising inured to the benefit of the manufacturer.

See also *A. N. Deringer, Inc., et al.* v. *United States*, 51 Cust. Ct. 475, Reap. Dec. 10634, in which it was held that selling costs, such as commissions paid to manufacturer's representatives, were part of the general expenses included in the cost of production of merchandise.

In the instant case, in view of the manufacturer's method of doing business, which was in fact to offer and sell the merchandise on an f.o.b. Laredo basis for the purpose of attracting United States customers; to enter the merchandise in its own name in Laredo; to have the merchandise insured and shipped for its account to Laredo; and to employ Export Shipping as its agent to handle the merchandise, the commission is actually a part of the selling expenses of the manufacturer and, therefore, a part of the cost of production, as that term is defined in section 402(f) of the Tariff Act of 1930, *supra*.

As to the merchandise appraised on the basis of export value, as defined in the new valuation statute, the Customs Simplification Act of 1956, it is claimed that the 5 percent commission is not a part of export value on the ground that the merchandise was offered for sale at an ex-factory price in Texcoco without the addition of the commission. Plaintiffs admit that the record indicates that the sales before the court were at the f.o.b. Laredo price, but claim that this cannot be used as the export value because it was not the price in the principal market of the country of exportation. It is claimed, therefore, that in the absence of sales, offers are determinative of export value and that the merchandise was freely offered at the ex-factory price. Defendant contends that all of the sales were at f.o.b. Laredo prices; that resort to offers cannot be made under the statutes, since there were actual sales; and that the plaintiffs have not overcome the presumption of correctness attaching to the appraiser's valuation.

The question of whether ex-factory prices or f.o.b. port prices represent export value has been before the court on numerous occasions, particularly in connection with inland freight charges. In *United States* v. *Paul A. Straub & Co., Inc.*, 41 CCPA 209, C.A.D. 553, it was held that where merchandise is offered only at an f.o.b. port price, which includes inland freight, and no sales are made on an ex-factory basis, the inland freight charges are part of export value. The court stated (p. 215) :

In the case before us it is a fact that the freely offered price to all purchasers for the merchandise was on an f.o.b. Bremen basis. There is no showing that the goods could be purchased at the invoice price less freight. The unit prices for the merchandise in the instant case included the inland freight charges at the time of purchase in Selb-Stadt, and as the appellant states, "Such inland freight is incorporated in and bound up with the cost to the seller of material and labor, and forms an integral part of the unit value and purchase price of each item. It is inseparable therefrom and is a charge *in* the principal market *at or prior to the time of shipment,* and does *not accrue subsequent to the time of shipment* to the United States." [Italics quoted.]

See also *Albert Mottola, an individual doing business under the name and style of Atlas Shipping Co.* v. *United States*, 46 CCPA 17, C.A.D. 689; *Delmonico International Corp.* v. *United States*, 52 Cust. Ct. 656,

511

A.R.D. 176; *Daniel F. Young, Inc., et al.* v. *United States*, 40 Cust. Ct. 860, Reap. Dec. 9173, appeal dismissed 42 Cust. Ct. 770, A.R.D. 107.

In *Batten & Co.* v. *United States*, 5 Ct. Cust. Appls. 447, T.D. 34975, it appeared conclusively that the goods could not be purchased other than from commissionaires or at prices less than those paid to them including the commission. The commission was, therefore, held to be in fact a part of the actual market value of the goods. The court quoted extensively from *United States* v. *Herrman et al.*, 91 Fed. 116, where it was stated that a commission paid by the importer to his agent for services in procuring, forwarding, or caring for the goods was not dutiable, but that the principle did not apply where the "commission" was a trade device to mislead customs officials and was used as the basis for a claim for a reduction from the real wholesale price.

The case of *Kurt Orban Company, Incorporated* v. *United States*, 49 Cust. Ct. 392, Reap. Dec. 10338, relied on by the plaintiffs, has been reversed by the appellate division and is now on appeal to the court of appeals. *United States* v. *Kurt Orban Company, Incorporated*, 51 Cust. Ct. 537, A.R.D. 163. In that case it appeared that SAPET was a Paris firm that sold wire and other products as exclusive sales agent for six manufacturing mills which owned SAPET. Prices were quoted ex-factory and bills with ex-factory prices were sent by the mills to SAPET. SAPET then prepared its own invoice to the purchaser, which was the same as the manufacturer's invoice except that an amount was added for inland freight and f.o.b. charges. The buyer was responsible for the merchandise on shipment from the factory to the United States and insured the merchandise when it left the factory. The charge for inland freight was a fixed charge and not the actual freight charge. The purchaser paid the total invoice charge and SAPET remitted the ex-factory price to the manufacturer. While there was a statement in an affidavit that it was always possible for any purchaser to take delivery at the factory and arrange and pay for transportation and loading of the merchandise directly, there was no evidence that this had ever been done. The court held that the market price was the price at which SAPET billed the merchandise, which included an arbitrary sum for inland freight and f.o.b. charges.

In the instant case, the only sales of which evidence was presented were at f.o.b. Laredo prices which included the 5 percent commission. The sales that were mentioned as being at f.o.b. Texcoco prices with delivery by air freight appear also to have included this commission. In fact, there is no evidence of any actual purchases, whether f.o.b. Laredo or not, which did not include the 5 percent commission. The record is not sufficient to establish that the merchandise could have been purchased without payment of the 5 percent. The commission was an integral part of the purchase price in the principal market at

or prior to the time of shipment. It did not accrue subsequent to shipment. Whether or not the merchandise was freely offered for sale at ex-factory prices is doubtful; in any event, since there were sales, offers may not be considered under the language of section 402(b), *supra*. The commission was clearly not a buying commission and the weight of the evidence establishes that Export Shipping was not retained by the purchasers to act for them. In most cases they had no knowledge of its existence. Therefore, it cannot be said that it was their agent and that the services rendered by it were for their account. The services were rendered for the account of the seller, for whom the shipment was made and entered at Laredo and who offered the merchandise at a price which included the commission. Under these circumstances, the commission is an integral part of the purchase price and was properly included by the appraiser as a part of the export value of the merchandise.

On the record as presented, I find as facts:

1. That the merchandise involved herein consists of wool hooked rugs, exported from Mexico between July 26, 1956, and February 27, 1959.

2. That the merchandise, which was exported prior to February 27, 1958, was appraised on the basis of cost of production, as that value is defined in section 402(f) of the Tariff Act of 1930.

3. That the merchandise which was exported on or after February 27, 1958, was appraised on the basis of export value, as that value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.

4. That the appraisements in all shipments were at an amount equivalent to the invoice unit price in Mexican currency, plus a 5 percent commission or charge made by Export Shipping Office.

5. That the parties are in agreement that the respective bases of appraisement are correct, but plaintiffs claim that the addition of 5 percent to the invoice unit prices was improper.

6. That the merchandise was manufactured by El Bordador, S. de R.L., or Tapetes Luxor, S.A., in Texcoco, Mexico, and was shipped by it to Export Shipping Office, S.A., in Mexico City.

7. That the principal stockholder of the said corporations was Michael Salle; that they were operated under the supervision and direction of the same general manager; that some employees worked for both the manufacturing companies and Export Shipping; that there was a very close relationship between the companies.

8. That orders for merchandise were received by Export Shipping which transmitted them to the manufacturers; that it received copies of the mill order control sheets, and received the merchandise when it was completed.

9. That the manufacturer prepared invoices showing an f.o.b. Texcoco price which were forwarded with the goods to Export Shipping. That Export Shipping prepared all other documents which accompanied the shipment to the United States and sent copies of the same to the United States customer together with a debit note listing charges for import duties, freight and clearance; insurance; 5 percent commission; and the f.o.b. Texcoco price.

10. That the manufacturer offered the merchandise for sale to United States customers through sales agents. That the agents were furnished two pricelists, one f.o.b. Texcoco, and the other f.o.b. Laredo. That sales were made at f.o.b. Laredo prices, except for some sales at f.o.b. Texcoco prices where the merchandise was shipped by air freight. That the purpose of offering the merchandise f.o.b. Laredo was to attract United States customers.

11. That the f.o.b. Laredo prices included the 5 percent commission paid to Export Shipping. That purchasers who shipped by air also paid a 5 percent commission to Export Shipping.

12. That the purchasers did not retain Export Shipping as their agent; that in most cases they did not know of its existence.

13. That where the merchandise was shipped through Laredo, it was entered in the name of the manufacturer; that the insurance and transportation were for the account of the manufacturer; that Export Shipping acted as agent for the manufacturer in handling the merchandise.

14. That there is no evidence of any actual sales which did not include the 5 percent commission.

I conclude as matters of law:

1. That cost of production, as that value is defined in section 402 (f) of the Tariff Act of 1930, is the proper basis of appraisement for the merchandise exported from Mexico prior to February 27, 1958.

2. That the 5 percent commission paid to Export Shipping is a part of the selling expense of the manufacturer and is a part of the "usual general expenses" included in cost of production.

3. That the cost of production of the merchandise exported prior to February 27, 1958, is represented by the appraised values.

4. That export value, as that value is defined in section 402 (b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis of appraisement for the merchandise exported from Mexico on or after February 27, 1958.

5. That the 5 percent commission paid to Export Shipping is an integral part of the purchase price of such merchandise and is a part of the export value.

6. That the export value of the merchandise exported on or after February 27, 1958, is represented by the appraised values.

Judgment will be rendered accordingly.