(A.R.D. 159)

United States *v.* Aceto Chemical Co., Inc.
Aceto Chemical Co., Inc. *v.* United States

Entry No. 1006152.

## Second Division, Appellate Term

(Decided July 8, 1963)

*John W. Douglas*, Assistant Attorney General (*Daniel I. Auster*, trial attorney), for the United States.

*Samuel I. Hendler* (*Richard M. Michaelson* of counsel) for the importer.

Before LAWRENCE, RAO, and FORD, Judges

RAO, Judge: These are applications for review of a decision and judgment holding the American selling price of a coal-tar chemical, known as acetoacetanilide, to be 72¾ cents per pound. The finding of the trial judge is challenged by both parties in cross-appeals; the United States-appellant, contending for the appraised value of 80 cents per pound, plaintiff-appellant for a value of 72.22 cents per pound.

It is conceded for all purposes that American selling price, as that value is defined in section 402(e) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis for the determination of the value of the subject importation of acetoacetanilide, and it appears that the appraiser's return of 80 cents per pound represents the price at which such merchandise was sold by an American producer, the Union Carbide Corp., to certain of its customers. The value found by the trial court was predicated upon sales to a customer of said Union Carbide Corp., identified in the record as customer I. Importer-appellant likewise relies on sales to said customer I, but contends that an item of freight in the amount of 0.53 cent per pound was improperly included in the trial court's finding of value.

American selling price is defined in said section 402(e), as amended, *supra*, as follows:

For the purposes of this section, the American selling price of any article produced in the United States shall be the price, including the cost of all con-

tainers and coverings of whatever nature and all other expenses incidental to placing the article in condition packed ready for delivery, at which such article is freely sold or, in the absence of sales, offered for sale for domestic consumption in the principal market of the United States, in the ordinary course of trade and in the usual wholesale quantities, or the price that the manufacturer, producer, or owner would have received or was willing to receive for such article when sold for domestic consumption in the ordinary course of trade and in the usual wholesale quantities, at the time of exportation of the imported article.

In subdivision (f) of said section 402, as amended by the Customs Simplification Act of 1956, the following definitions of terms are provided:

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

    (A) to all purchasers at wholesale, or

    (B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

(2) The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

(3) The term "purchasers at wholesale" means purchasers who buy in the usual wholesale quantities for industrial use or for resale otherwise than at retail; or, if there are no such purchasers, then all other purchasers for resale who buy in the usual wholesale quantities; or, if there are no purchasers in either of the foregoing categories, then all other purchasers who buy in the usual wholesale quantities.

By stipulation of the parties entered into during the course of trial, it was agreed, *inter alia*, that acetoacetanilide is a coal-tar product, dutiable in accordance with the provisions of paragraph 27(a)(3)(5) of the Tariff Act of 1930, as modified, at the rate of 3½ cents per pound, plus 25 per centum ad valorem, which, by virtue of paragraph 27(c) of said act, as amended by the Customs Simplification Act of 1956,[1] is subject to valuation on the basis of American selling price; that this product is manufactured and sold in the United States by the Union Carbide Corp.; that New York is the principal market in the United States for the sale of acetoacetanilide; and that 250 pounds or more constitute a usual wholesale quantity.

[1] Paragraph 27(c), as amended, *supra:*
    The ad valorem rates provided in this paragraph shall be based upon the American selling price of any similar competitive article manufactured or produced in the United States. If there is no similar competitive article manufactured or produced in the United States then the ad valorem rate shall be based upon the United States value.

It was further agreed that, at the time of importation, a chemical called acetoacetanilide was manufactured by the Food Machinery & Chemical Co., and sold by it to the United States Industrial Chemical Division of the National Distillers Corp. (hereinafter called "USI") which, in turn, resold the merchandise in the United States. Although counsel for plaintiff below refused to concede that the USI product was exactly the same, the record contains the following statement of importer's vice president-treasurer, Arnold Frankel—

\* \* \* Some people who we approached told us that there are slight differences in the end product when using our material compared to U.S.I. However, we have never encountered a situation of that sort with respect to our material versus Union Carbide's. On the other hand, I have not heard from anyone that either our material or Union Carbide's could be used in a place where U.S.I.'s could not.

Mr. Frankel, whose knowledge of acetoacetanilide derived both from his background as a chemical engineer and his personal experience in the purchase and sale of that chemical, also testified that this product is primarily used in the manufacture of certain organic yellow pigments called Hansa yellow and benzidine yellow; that the annual consumption thereof in the United States amounts to between 1,500,000 to 2,000,000 pounds, of which some five to six hundred thousand pounds are imported; that Aceto Chemical Co., Inc., imports approximately 400,000 to 500,000 pounds of acetoacetanilide; and that there are other importers of this product.

Predicated upon comparison of specifications of the imported product with that manufactured by Union Carbide Corp., Mr. Frankel was of opinion that they were substantially the same and could be used interchangeably, but, as hereinabove noted, he did not agree that identical end results were achieved by the USI material.

The second witness for the importer was Fred J. Rauscher, product manager for Union Carbide Corp., whose appearance at the trial was in response to a subpoena duces tecum to produce the books and records of his company relating to the manufacture and sale of acetoacetanilide. In connection with the testimony of this witness, there was introduced into evidence as plaintiff's exhibit 5 a list of sales made by Union Carbide Corp. during the first 4 months of 1960, which, it was agreed, constituted a representative period for the consideration of the sales practices of said corporation at or about the time of exportation of the instant merchandise. The list embraces 51 sales to customers, identified alphabetically from A through R, and shows dates of sale, quantities, price per pound, and total price.

Mr. Rauscher, also a graduate chemist with considerable experience in the marketing procedures for acetoacetanilide, agreed that the principal use of this chemical in the United States was for the production of Hansa yellows and benzidine yellows; that the only two

domestic manufacturers of this material during the relevant period were Union Carbide and Food Machinery Corp.; and that their products were competitive.

In explanation of the fact that plaintiff's exhibit 5 shows prices varying from 72¾ cents per pound to 81 cents per pound, this witness stated that the price to customer J at 80 or 81 cents per pound was the established schedule price for the product, 81 cents being the price for less than carload quantities, 80 cents for carload lots or combination carload lots; that all sales were f.o.b. shipping point with freight allowed; that freight to the nearest customer was 0.53 cent per pound; that these were the only prices at which the merchandise was freely offered to all customers in the United States in the ordinary course of trade and in the principal market; and that if a customer desired to use his own truck, he might be allowed the cost of the freight, but that no such situation had ever occurred. Lower prices paid by other customers resulted when such customers advised the company that they could and would obtain this material from importers at those prices, and one or another of his superiors in the company would then agree to meet the competition.

He further testified that although customer J was the purchaser of the largest quantity of acetoacetanilide during this period, to wit, 104,000 pounds, it did not, to the best of his knowledge, request a reduction in price, nor did he know whether or not customer J had information that lower prices might have been negotiated. He conceded that if this customer produced evidence that the commodity was available at 74 cents per pound, for example, on the same terms as his company was offering it, he probably would have recommended that acetoacetanilide be made available to customer J at the lower price. However, he explained that frequently purchasers of large quantities of a commodity such as this are more interested in maintaining an adequate source of supply than in seeking lower prices. In this connection, the witness stated—

No, in answer to the question, splitting the question into two parts, you have asked whether it would be logical that a large customer would expect a lower price, and I have answered that by saying that the large customer might not look for a lower price, or expect lower prices, if he were satisfied with the goods that he was buying, that it did the job for him; that he wanted to retain the continuity in supply of an established source. The second part of the question was whether he is entitled to the lower price. I answered when I said the entitlement or meeting of the lower price would depend upon whether or not the customer brought to us evidence showing that he had obtained an offer from another company for this product at the lower price. It is not incumbent, as I see it, to decide whether a customer is entitled to a price or not.

Mr. Rauscher also testified that once a price was established for a customer by the New York office of his company, orders could be

accepted at any district office, wherever located; that, ordinarily, where a lower price was approved, it did not need to be reestablished over the short period of time covered by the sales listed on exhibit 5; and that two orders, totaling 25,950 pounds at 80 cents, and a total of 41,500 pounds at 81 cents were accepted in district offices outside New York. These figures included 10,950 pounds sold to the California Ink Co. (presumably customer D) through the west coast office.

He further stated that he would estimate that Union Carbide sold about 65 per centum of the market for this product, the remaining 35 per centum being divided more or less equally between Aceto Chemical Co., Inc., and USI.

James J. O'Connor, Jr., customs examiner at the port of New York, was also called by plaintiff below. He stated that he is in charge of all coal-tar products dutiable under paragraphs 27 and 28 and that, in keeping abreast of market prices in this field, he has two sources of information. Domestic manufacturers of coal-tar products register their merchandise, with full specifications, with the United States chemist at New York, and supply the examiner with full pricelists.

In analyzing the provisions of section 402(e), as amended *supra*, in the light of the established facts of the case, the trial judge considered irrevelant prices at which acetoacetanilide was *offered* for sale, in view of the phrase in the section "in the absence of sales," and, finding that there was no one price at which the product was *sold* to all purchasers within the contemplation of the definition of "freely sold" in section 402(f)(1)(A), *supra*, accepted as representative of market value, within the intendment of section 402(f)(1)(B), *supra*, the price at which this chemical was sold to customer I, to wit, $72\frac{3}{4}$ cents per pound. In this connection, the trial judge was of opinion that, since the lowest price was freely negotiated by the principal domestic producer, it was not incumbent upon plaintiff to introduce evidence with respect to the sales prices and practices of USI.

The court further concluded that, inasmuch as there was no evidence to show that acetoacetanilide had ever been sold with freight allowance, and freight was, in fact, always incorporated into the sales price, there could be no deduction of freight in the determination of the value of the merchandise at bar.

Insofar as the issue of freight allowance is concerned, we have carefully considered the argument of plaintiff-appellant that the definition of American selling price, calling for a price of the merchandise "in condition packed ready for delivery," is distinguishable from the statutory definitions of foreign and export value in sections 402 (c) and (d) of the Tariff Act of 1930, as originally enacted, which looked to a price of merchandise "packed ready for shipment to the United States," but find no merit in the contention. The important factor

in the determination of whether or not inland freight charges are to be excluded in the determination of the value of imported merchandise is whether or not the merchandise is ever sold or offered for sale at prices which do not embrace freight charges. *United States* v. *Heffernan Paper Co.*, 13 Ct. Cust. Appls. 593, T.D. 41454; *United States* v. *Traders Paper Co. et al.*, 14 Ct. Cust. Appls. 293, T.D. 41909; *United States* v. *Zellerbach Paper Co. (Hoyt, Shepston & Sciaroni)*, 28 CCPA 303, C.A.D. 159; *United States* v. *Paul A. Straub & Co., Inc.*, 41 CCPA 209, C.A.D. 553; *Albert Mattola, etc.* v. *United States*, 46 CCPA 17, C.A.D. 689.

Regardless of whether the statutory definition alludes to place of shipment or place of delivery, the price to which it is addressed is the price which obtains in the principal market—the price at which the merchandise is sold or offered for sale in the ordinary course of trade. If there is no other price than the one which includes the freight charge, then, under settled law, the freight charge is inextricably bound up, as an integral part of the purchase price, and may not be allowed. The fact that, under circumstances not shown ever to have existed, a seller might be willing to deduct the cost of freight, if a customer desired to supply his own cartage, does not establish that, in the ordinary course of trade, such merchandise was sold or offered for sale at prices, less freight charge. "Evidence of a hypothetical market, or what a seller would do if confronted by conditions that do not exist, surely should not control over evidence of actual market conditions." *United States* v. *Traders Paper Co. et al., supra.*

Another objection suggests itself to the exclusion of freight charges from the market price of such or similar merchandse. If freight to the point of delivery forms no part of the price in the principal market, then, the price must be reduced by the amount of freight, and the question arises what amount shall that be—from what place of shipment to what place of delivery? Counsel for plaintiff-appellant has expressed a willingness to accept, as representative, freight from a point of shipment to the nearest customer, but, under his theory, if freight to the point of delivery is not properly a part of the price, then, it must follow that no freight charges may be considered in finding the selling price. The result then is a variety of prices reduced in each instance by a different freight rate. "Yet the law does not contemplate more than one price for the same merchandise at the same time in the same market." From the headnote in *John A. Steer & Co.* v. *United States*, 30 Cust. Ct. 504, Reap. Dec. 8196, cited with approval in *United States* v. *Paul A. Straub & Co., Inc., supra.*

We conclude, on this phase of the case, that there was no error in the trial court's holding "that the item of freight in the sale of aceto-acetanilide by the domestic producer was incorporated in the sales

price" and "is not an allowable deduction in the determination of the value of the involved merchandise."

We find ourselves unable to agree, however, that the price to customer I of 72¾ cents per pound was the American selling price of acetoacetanilide at the time the instant merchandise was exported. As we construe the present statutory definition of this basis of value, we are constrained to adopt an approach substantially at variance with that of the trial court.

It appears that the language comprising the present section 402(e), *supra*, was written into the Customs Simplification Act of 1956 as an incident in a comprehensive scheme to revise the valuation provisions of the Tariff Act of 1930. A study of the history of this piece of legislation reveals that the text of the new version was prepared by the United States Tariff Commission and, after the proposed law was introduced in the House of Representatives as H.R. 6040, the Tariff Commission submitted a report to the Committee on Ways and Means of the 84th Congress, first session, at its hearing on the measure, explaining the purposes of the revisions.

The overall object was, as the name of the statute itself implies, to simplify the application and construction of the provisions for determining the value of imported merchandise. To that end, except in instances not here material, foreign value, as defined in section 402(c) of existing law, was deleted from the new act, and export value, as redefined in the present section 402(b), was substituted as the primary basis of value. The changes effected in the definition of export value were carried over into the remaining bases of value wherever the language thereof permitted, and subdivision (f) of the new section 402 was inserted to define, for purposes of the section as a whole and wherever such language appeared therein, certain significant phrases.

Among the phrases included in said section 402(f) is the term "freely sold or, in the absence of sales, offered for sale," construed by the trial court to mean that if actual sales exist, offers of sales may not be considered.

In its report to the Committee on Ways and Means of the House of Representatives, the United States Tariff Commission made the following comments concerning the proposed new definitions of export value and American selling price:

Subsection (b) of the proposed new version of section 402 of the tariff act is a definition of "export value" which follows substantially the definition of that method of valuation in the existing section 402(d) of the tariff act. The phrase in the present definition of "export value" "at which such or similar merchandise is freely offered for sale" is changed to read "at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale." Although the present statute does not refer to actual sales, it is interpreted as permitting such sales to be considered in determining dutiable value. Thus, the proposed new language would not involve substantive changes in the valua-

tion basis, but would merely make explicit in the statute that actual sales *as well as offers for sale might be considered in determining dutiable value.* [Italics supplied.]

\* \* \* \* \* \* \*

The definitions of "American selling price" in subparagraph (e) of the proposed new version of section 402 follows the existing definition in section 402(g) of the tariff act, but with certain changes. The language "sold or, in the absence of sales" is inserted before "offered for sale" in the definition for the same reasons that it is inserted in the definitions of "export value" and "United States value." The language "to all purchasers" now appearing in section 402(g) is omitted for reasons discussed below in connection with the term "purchasers at wholesale," a definition of which is given in the proposed section 402(f)(3).

\* \* \* \* \* \* \*

"Purchasers at wholesale," defined in clause (3) of subsection 402(f), as set forth in the bill, is a term used in clause (1) of that subsection and is defined as "purchasers who buy in the usual wholesale quantities for industrial use or for resale otherwise than at retail; or, if there are no such purchasers, then all other purchasers for resale who buy in the usual wholesale quantities; or, if there are no purchasers in either of the foregoing categories, then all other purchasers who buy in the usual wholesale quantities." The term "all purchasers" in the present statute has been interpreted as meaning "all" in a sweeping literal sense. These words have caused considerable trouble in administering the valuation statute and the meaning ascribed to them by the courts does not comport with actual conditions under which a large part of the commerce of the world is conducted. The construction placed on the term "all purchasers" by the courts has caused a departure from the concept of tariff valuation of the United States as being predicated on transactions at the wholesale level. The courts have gone beyond the wholesale level and wholesale practice, with the result apparently that the merchandise cannot be considered as freely offered to "all purchasers" unless they are offered under such conditions as will enable every class of buyer who might care to buy to make purchases on equal terms and conditions, whether they are wholesalers, retailers, consumers, etc. This construction is evidently impractical in the face of actual business realities and should be corrected. The definition of "purchasers at wholesale" provided for in the bill is a practical and realistic one and will enable the increased use of the primary basis of valuation.

Virtually the same explanations of export value, American selling price, and the term "purchasers at wholesale" were presented to the House of Representatives in session as Committee of the Whole House, by Representative Jere Cooper, chairman of the Committee on Ways and Means. (Cong. Record, vol. 101, part 7, 84th Cong., 1st sess., pp. 8978, 8982, 8983.) Presumptively, therefore, and in view of the fact that these particular phrases were incorporated into the new act, without change in the recommended text, it may fairly be assumed that Congress intended them to be construed consistently with the foregoing statements. That it is the intent of Congress which ultimately governs the interpretation of its enactments is a fundamental precept of statutory construction. *Sandoz Chemical Works, Inc.* v. *United States,* 43 CCPA 152, C.A.D. 623; *United States v. Herman H. Sticht & Co.,* 22 CCPA 40, T.D. 47048; *United States* v. *Clay Adams Co., Inc.,* 20 CCPA 285, T.D. 46078.

While it is true that, in a strict sense, the words "freely sold or, in the absence of sales, offered for sale" are susceptible of the interpretation given by the trial court that the existence of actual sales *per se* precludes consideration of offers for sale, we question whether, in view of the foregoing statement of purpose, Congress could have intended that offers of sale be ignored when actual sales must be rejected because they do not establish a single price at which merchandise is sold to all purchasers.

It must be remembered that the present definition of American selling price retains that portion of the prior definition which rendered relevant "the price that the manufacturer, producer, or owner would have received or was willing to receive for such article when sold for domestic consumption in the ordinary course of trade and in the usual wholesale quantities." If the price a manufacturer would be willing to receive will suffice to establish an American selling price, then, it would appear to be unreasonable to refuse to consider offers of sale merely because actual sales not measuring up to the statutory specifications have been shown.

The concept that "the law does not contemplate more than one price for the same merchandise at the same time in the same market," *John A. Steer & Co.* v. *United States, supra,* was invoked by the trial court to support its rejection of actual sales as indicative of American selling price. So far as its finding of fact is concerned that all sales to all purchasers were freely negotiated and that lower prices were freely allowed when proper request was made, there is ample evidence in the record to support it. The conclusion predicated upon that finding that there was no one price at which acetoacetanilide was freely sold to all purchasers in the usual wholesale quantities and in the ordinary course of trade is, therefore, sound. It is the interpretation of the language of the law, as a result of that conclusion with which we are constrained to differ.

Although the phrase "to all purchasers" has been eliminated from the principal definitions of value, wherever it had theretofore appeared, to avoid the implications of the broad construction judicially applied, it is, nevertheless, not removed from consideration in the determination of the price at which merchandise is freely sold. It is expressly embraced within the definition of the term "freely sold or, in the absence of sales, offered for sale," which the law describes as sales without restrictions, etc., either to all purchasers at wholesale, or "in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise."

What the trial court has done in the present instance was, finding that acetoacetanilide was not freely sold to all purchasers at whole-

sale, within the statutory meaning, to reject offers of sale to all purchasers and to select a price to one purchaser which, in its opinion, "fairly reflects the market value of the merchandise." We do not believe that this was a permissible alternative available to the court under the circumstances of this case. It is our opinion that subdivision (f) (1) (B) was designed to overcome situations such as were involved in *United States* v. *Heemsoth-Kerner Corp.*, 31 CCPA 75, C.A.D. 252, wherein the seller restricts his sales to one or more selected purchasers and does not sell or offer his merchandise for sale to all purchasers at wholesale. By every intendment, the language of the alternative definition of "freely sold or, in the absence of sales, offered for sale" is addressed to the commercial practices of the seller in the ordinary course of trade and was designed to eliminate certain judicial pronouncements concerning restricted or controlled markets. It does not provide an option to the court to single out one purchaser at wholesale who pays a price deemed to be consistent with market value, when all purchasers at wholesale are afforded an opportunity to buy.

In any event, there was no occasion, in the present instance, to resort to the provisions of section 402 (f) (1) (B) to find an American selling price for acetoacetanilide. As has been heretofore observed, although actual sales existed, they must be disregarded, because they do not establish one price for this merchandise. Hence, in contemplation of law, there was, in effect, an absence of sales, and offers for sale became relevant and necessary elements in the determination of American selling price.

It does not seem to be seriously disputed, in the instant case, that the list price of carload or combination carload lots of acetoacetanilide was 80 cents per pound, delivered, or that all offers of sale in usual wholesale quantities and in the ordinary course of trade in the principal domestic market were freely extended to all customers at that price. Since that is the only price which conforms to the statutory definition of American selling price, it was properly returned by the appraiser as the value of the merchandise at bar. In view of the conclusions reached herein, we do not deem it necessary to comment upon the lack of proof of the sales practices of USI. The court, therefore, makes the following findings of fact:

1. The merchandise involved herein consists of acetoacetanilide, a coal-tar product, exported from England on April 8, 1960.

2. Said merchandise was appraised on the basis of American selling price, as that value is defined in section 402 (e) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, at 80 cents per pound, by virtue of the provisions of paragraph 27 (c) of said act, as so amended.

3. It is the claim of plaintiff-appellant that the proper American selling price of acetoacetanilide, at or about the date of exportation of the merchandise at bar, was 72.22 cents per pound.

4. At all times pertinent hereto, said chemical was manufactured and sold in the United States by Union Carbide Corp. It was also manufactured by the Food Machinery & Chemical Co. and sold by it for distribution to United States Industrial Chemical Division of the National Distillers Corp.

5. That New York is the principal market in the United States for the sale of acetoacetanilide.

6. That 250 pounds or more constitute a usual wholesale quantity.

7. Said Union Carbide Corp. sells approximately 65 per centum of all acetoacetanilide distributed in the United States.

8. The list price to all purchasers at wholesale for the Union Carbide Corp. product is 80 cents per pound, f.o.b. shipping point, freight included, for carload lots or combination carload lots.

9. All sales made by Union Carbide Corp. are at the list price, unless a lower price is granted to a customer who produces evidence of the ability and intention to purchase at a lower price, and, under such circumstances, lower prices are freely negotiated.

10. There was no single price at which said Union Carbide Corp. sold this chemical to all purchasers at wholesale.

11. The lowest freight cost from point of shipment to point of delivery was 53 cents per 100 pounds.

We conclude, therefore—

1. That American selling price, as that value is defined in section 402(e), as amended by the Customs Simplification Act of 1956, is the proper basis for the determination of the value of the instant merchandise.

2. That, by the terms of said definition, where there is no single price at which merchandise is sold to all purchasers at wholesale, offers for sale to all purchasers at wholesale which otherwise conform to the statutory description must be considered in arriving at a value based on American selling price.

3. That, where there is no evidence of restriction of sales to one or more selected purchasers, the provisions of section 402(f)(1)(B) of said Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, are not applicable.

4. That, where a charge for freight is always included in the price at which merchandise is sold or offered for sale, it is an integral part of such price and may not be deducted in determining statutory value.

5. That the American selling price of the involved merchandise was 80 cents per pound.

The decision and judgment of the trial court are, therefore, reversed. Judgment will be entered accordingly.