(Reap. Dec. 11056)

BUD BERMAN SPORTSWEAR, INC. v. UNITED STATES

Entry No. 704803.

(Decided August 12, 1965)

*Barnes, Richardson & Colburn* (*Hadley S. King* and *Norman C. Schwartz* of counsel) for the plaintiff.

*John W. Douglas*, Assistant Attorney General (*Herbert L. Warren* and *Arthur H. Steinberg*, trial attorneys), for the defendant.

RAO, Chief Judge: This is an appeal for reappraisement of an importation of men's cotton dress and sport shirts from Hong Kong. The various items of merchandise involved in the present shipment were entered at their invoice unit prices per dozen, which prices were exclusive of handling and freight charges. They were appraised at f.o.b. unit prices per dozen which, as will be amplified, *infra*, were approximately 2.3 per centum more than the invoiced ex-factory prices.

It is not disputed that export value, as that value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper statutory basis for the determination of the value of the merchandise here under consideration. This provision reads as follows:

(b) EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

At the trial of this action, two witnesses were called to testify in behalf of plaintiff. The first was Mr. Harry Fichtenbaum, the customs examiner at the port of New York who passed on the merchandise which is the subject of this appeal for reappraisement. Mr. Fichtenbaum stated that the figures which he used to represent export value were his concept of f.o.b. Hong Kong values which, he was permitted to state over objection of counsel for the Government, were calculated by adding the inland charges, as set forth on the invoice, to the ex-factory unit prices therein shown. In that calculation, he ascertained that the charges constituted 2.3 percent of the total, and he added that percentage to the ex-factory unit prices as shown.

The parties thereupon stipulated that Mr. Aaron Bodner, assistant appraiser at the port of New York, who was then present in court pursuant to subpoena issued by the plaintiff, had approved the action of Examiner Fitchtenbaum with respect to the invoice here under consideration.

Plaintiff's second witness was William T. L. Yao who testified that he is the managing director of Smart Shirts Manufacturers, Ltd., of Hong Kong and that his company was the seller and shipper of the subject merchandise. His testimony reveals that this company was established by him in 1956 and that, as managing director, it was his function to handle all sales, most of the purchases of material, production, and nearly every other phase of the business. This company

employs approximately 1,950 workers, and, in the volume of merchandise which it manufactures, it is probably equal to the production of any 5 other Hong Kong manufacturers.

On or about December 22, 1960, Mr. Yao's company entered into an agreement with the plaintiff herein for the manufacture and sale of approximately 450,000 dozen dress and sport shirts over the course of a period of 3 years. A copy of the contract was received in evidence as plaintiff's exhibit 1. The contract contained specifications as to style, production and delivery, material to be used, shipments, cases and packing, prices, and payment, and it was specifically agreed between the parties that the prices for the merchandise covered by the contract were fixed on an ex-factory rather than an f.o.b. basis, with the seller undertaking to rebate any excess duties which the buyer might be required to pay in the event that United States customs officials returned an f.o.b. rather than an ex-factory value for the subject shirts.

On or about June 2, 1961, the parties entered into a second contract (purchase order No. 9922–A), plaintiff's exhibit 2, which called for the purchase of 149,090 dozen long and short sleeve shirts under the terms and conditions of the basic agreement, which second agreement specified the f.o.b. Hong Kong price per dozen, as well as the delivery dates and styles of the shirts to which it related.

On November 28, 1961, an agreement, received in evidence as plaintiff's exhibit 3, was entered into to implement the basic agreement of December 22, 1960, and supplement the order of June 2, 1961. It called for the purchase of additional quantities of shirts under the same terms.

On or about May 11, 1962, at a time when Mr. Yao was visiting in New York, the parties amended the agreement of November 28, 1961, (plaintiff's exhibit 4) by directly specifying the following:

Commencing with shipments of long sleeve dress shirts in the Fall 1962, which shipments are scheduled to commence approximately April 15, 1962, it is mutually agreed that these shipments will be paid for by the Buyer to the Seller on the basis of "Ex-Factory". The "Ex-Factory" price shall be determined by taking the prices as designated on our order dated June 2, 1961 (as supplemented by the Agreement dated November 28, 1961) as a base and adding or subtracting from these prices the appropriate changes in the prices per yard of piece goods used in the manufacture of these shirts multiplied by the number of yards per dozen as shown on our order dated June 2, 1961. In addition to this you will subtract from this price the flat sum of 24 cents per dozen.

The Seller agrees to cause the aforementioned shirts to be shipped to and placed on board the ocean going vessel as it has done in the past. The Seller further agrees to pay on behalf of the Buyer the necessary costs to store and to ship the merchandise to the pier in Hong Kong and to further place these shirts on board an ocean going vessel. The Seller will render invoices to the Buyer, with the substantiating invoices and/or documents for such costs as are incurred by the Seller in placing and shipping the shirts "on board" the ocean going vessel.

The Buyer agrees to make prompt reimbursement to the Seller for such charges upon receipt of such invoices.

It is mutually agreed between the Seller and the Buyer that although the price of the shirts is determined and sold on an "Ex-Factory" basis actual title to the goods shall not pass from the Seller to the Buyer until such time as all of the conditions of the Irrevocable Letter of Credit are met by the Seller.

Also, on May 11, 1962, a further supplemental contract, plaintiff's exhibit 5, was entered into for the purchase of additional shirts in quantities specified for delivery during the latter part of 1962 and the early part of 1963. This agreement likewise specified that the prices were ex-factory and that the seller would render invoices to the buyer substantiating all costs incurred in storing the merchandise, shipping it to Hong Kong, and placing it on board the ocean-going vessel.

A paper identified by the witness as a final pricelist submitted to Bud Berman Sportswear, Inc., for reference on documentation, was received in evidence as plaintiff's exhibit 6. It was prepared by an employee of the company for the convenience of the plaintiff and contains the following items: style number, width of the fabric, yardage, unit price of the piece goods, material cost per dozen, the cost of cutting, making, and trimming per dozen, and the ex-mill Hong Kong prices, which include packing but none of the inland charges from the factory to the vessel.

There was received in evidence as plaintiff's exhibit 7, over objection by counsel for the Government that it consists of a memorandum only, a list of the various items enumerated on the invoice as handling charges. Whether or not this exhibit possesses any evidentiary value is of no moment in this action, since the items enumerated thereon are substantiated by plaintiff's exhibits 8, 9, and 10, consisting, respectively, of an invoice from British International Underwriters to Smart Shirts Manufacturers, Ltd., for insurance for the merchandise here involved in the sum of $73.98; an invoice from Columbia Transport Co. to Smart Shirts Manufacturers, Ltd., for the account of Bud Berman Sportswear, Inc., U.S.A., for truckage from the factory to the godowns (warehouses) for storage and shipment in the sum of $270.36; and an invoice from The Hongkong & Kowloon Wharf & Godown Company, Limited, for storing and shipping the involved merchandise in the sum of $707.88. Mr. Yao stated that there was an adjustment on the bill rendered by the storage company and the rebate resulted in the figures actually shown on the invoice covering the instant merchandise, which, together with other official papers in the entry, but excluding any hearsay statements contained in any portion thereof, was received in evidence.

Mr. Yao further stated that, during the period between 1960 and 1963, it was the practice of his company to offer its shirts for sale

for export to the United States on an ex-mill basis, wherever possible, as in the cases of sales to the plaintiff, sales to a company identified as C.B.S., and sales to Montgomery Ward. Where, however, the customer wished to purchase on an f.o.b. basis, as in the case of the Woolworth Co., it was accommodated.

This witness further testified that there was associated with him in Smart Shirts Manufacturers, Ltd., a gentleman by the name of K. T. Wong. He has been with the company since its formation in 1956, but their business relationship dates back to 1948. Mr. Wong's sole function in the firm, according to Mr. Yao, was to supervise finances. He is neither a bookkeeper nor an accountant, but is in charge of the bookkeeping division. From his knowledge of Mr. Wong, the witness stated that his formal education ended with graduation from high school, and that while he speaks English, he is not fluent in the language.

On cross-examination, Mr. Yao further testified that he did not believe that Mr. Wong knew under what circumstances the company's merchandise was sold even though he is a director of the company. He did not handle sales, but only the financial end of the business. "His duties in my company are to see that we collect money, we make payments, and we utilize the cash."

In connection with sales to Bud Berman Sportswear, Inc., Mr. Yao stated that his company pays all charges involved in transporting the merchandise from the mill to the ship and draws against the letter of credit opened by the purchaser both for the price of the merchandise and the charges paid. Moreover, in most of the transactions, it was customary for him to break down the cost of the shirts which his company sold so as to specify the cost of material, the amount of yardage, the cost of making, the cost of shipping, and even the ocean freight. It is primarily his intention to sell on an ex-factory basis as is indicated by his answer to the following question put by the court:

CHIEF JUDGE OLIVER:[1] Am I correct, Mr. Yao, in understanding that you quoted the buyer ex-mill price, but if he wanted an f.o.b. price you would add on the charges between the mill and the boat or ship, and say, "Yes, if you want an f.o.b. price, here is the price, plus these charges, and here is your f.o.b. price;" you did the figuring for him, is that right?

THE WITNESS: Yes, your Honor.

To the best of the recollection of this witness, sales to C.B.S. were on an ex-mill basis. He believed he had sold on some previous occasion to Bardon of Hollywood on an f.o.b. basis, but he was positive that sales to Montgomery Ward, for example, were always ex-factory. Indeed, Montgomery Ward paid all subsequent charges; "* * * they

---

[1] Effective June 25, 1965, the position of chief judge was relinquished by Judge Oliver, and the writer of this opinion was designated by President Lyndon B. Johnson to succeed him.

have their own trucking company, they have their own godown, choosing their own, and they do all their own documentation." The witness did not even know how much Montgomery Ward actually paid for these various services.

On behalf of the defendant, there was introduced into evidence, as defendant's collective exhibit A, a report of Stewart H. Adams, the United States Customs Representative at Hong Kong, dated May 21, 1963, with accompanying exhibits A through L. In his report, Mr. Adams summarized the substance of an interview with Mr. K. T. Wong on April 7, 1963, and on several subsequent occasions. Of particular interest to the instant case, is the categorical statement therein contained that Mr. Wong advised Mr. Adams that Smart Shirts Manufacturers, Ltd., never sold its merchandise other than on an f.o.b. basis and that it was customary for it to deduct 24 cents per dozen from the original f.o.b. prices to show the ex-factory prices, packing included.

Mr. Adams further stated that, according to Mr. Wong, Bud Berman is the only importer for which the seller itemizes f.o.b. charges and that all others pay either a flat rate of 24 cents per dozen or 2 to 3 percent of the ex-factory prices.

Attached to the report are records of transactions with various exporting companies and American importers of cotton shirts, tending generally to support the statement that sales of the manufacturer were negotiated on an f.o.b. basis. However, no reference is made in the documents accompanying defendant's collective exhibit A to transactions between Smart Shirts Manufacturers, Ltd., and Montgomery Ward & Co. as to which, it may be recalled, the witness Yao emphatically indicated ex-factory sales.

In an affidavit introduced into evidence as plaintiff's exhibit 11, verified on March 6, 1964, Mr. Wong stated that, to the best of his recollection, he did not advise Mr. Adams either that Bud Berman pays an f.o.b. price or that Smart Shirts had never sold its merchandise to any buyer on an ex-factory basis. He stated that his function with the company is limited to handling books and accounts and that there are some phases of the business with which he is not familiar. Moreover, he is not too fluent in English and did not fully understand the implications of the questions which were asked of him. Indeed, there were occasions when it was necessary for him to request that the questions be repeated because he did not fully understand their meaning.

In a supplemental report, received in evidence as defendant's exhibit B, Mr. Adams controverted statements of Mr. Wong. He asserted that he believed that Mr. Wong understood English sufficiently, so that he had no problem with the questions asked, and that when technical questions were posed which were beyond his knowl-

edge, he was always able to obtain the proper answer from a junior member of the firm in charge of that particular phase of the company's business. Mr. Adams further stated that he had spent 5 or 6 days in the office discussing the matter with Mr. Wong and his subordinates and that he believed that Mr. Wong was quite open and cooperative in his responses.

He also reported that he visited the office of Smart Shirts Manufacturers, Ltd., again in April 1964 in the company of Customs Representative Perry J. Spanos and a translator-interpreter, C. S. Chow. However, it was not necessary to use the services of the interpreter as Mr. Wong conversed freely in English. Mr. Adams stated that Mr. Wong indicated that by reason of the many diversified questions that were asked of him, he did not fully understand the meaning of the inquiry, and that he did not believe that Mr. Adams understood what he was saying in connection with the value of the shirts sold by his company. Mr. Adams concluded his report with the following statement:

* * * However, I am sure that I did not misunderstand or misquote Mr. Wong. This is further substantiated by the fact that on April 6, 1964, Mr. Wong denied making the statement regarding the agreement on rebate which is on page 3, paragraph 3, of my report.

Attached to defendant's exhibit B are some of the handwritten notes made by Mr. Adams at the time of his initial investigation of the sales practices of Smart Shirts Manufacturers, Ltd. Included in said penciled notations is the statement "Not freely offered to all buyers. Bud B is only buyer at Ex. Fy Bud pays FOB prices."

It is apparent from the evidence which has been adduced in this case that the court is here confronted with a problem of a type which has occupied the attention of this and our appellate court on many occasions in recent years. The heart of the issue is the question of when and under what circumstances charges which accrue subsequent to the time when goods manufactured in a foreign country leave the factory, or the principal market, are part of the market value of such or similar merchandise.

Under principles which have crystallized over the course of time, it is by now well established that where merchandise is offered for sale or sold on an ex-factory basis, or in the principal market of the country of exportation if it be other than the factory, at a price which does not include the charges, they are not to be considered as a part of the statutory value of the merchandise. *United States* v. *Lyons*, 13 Ct. Cust. Appls. 639, T.D. 41484. Where, however, the price includes the charges and the merchandise is never offered for sale or sold at any other price, then the charges are said to be inextricably bound up with the cost of the merchandise and form an integral part of the unit

value thereof. *United States* v. *Paul A. Straub & Co., Inc.*, 41 CCPA 209, C.A.D. 553; *Albert Mottola, etc.* v. *United States*, 46 CCPA 17, C.A.D. 689.

As this court stated in *United States* v. *Aceto Chemical Co., Inc.*, 51 Cust. Ct. 507, A.R.D. 159, affirmed *Aceto Chemical Co., Inc.* v. *United States*, 51 CCPA 121, C.A.D. 846—

* * * The important factor in the determination of whether or not inland freight charges are to be excluded in the determination of the value of imported merchandise is whether or not the merchandise is ever sold or offered for sale at prices which do not embrace freight charges. * * *

The distinction between these two types of transactions is clear enough. Difficulties arise, however, in evaluating the proof as to market conditions and terms under which imported merchandise is sold.

In this, as in all appeals for reappraisement, by virtue of statutory prescript, a presumption of correctness attaches to the value initially found by the appraiser, and the burden rests with the party who challenges that value to prove not only that the appraiser's action was erroneous, but that the claimed value is proper. 28 U.S.C., section 2633; *Brooks Paper Company* v. *United States*, 40 CCPA 38, C.A.D. 495; *Kenneth Kittleson* v. *United States*, 40 CCPA 85, C.A.D. 502; *Kobe Import Co.* v. *United States*, 42 CCPA 194, C.A.D. 593.

In order for a plaintiff to substantiate a value different from that returned by the appraiser, it is ordinarily incumbent upon him to establish every material element included in the statutory basis of value upon which he relies. *Brooks Paper Company* v. *United States*, *supra*. However, under certain circumstances, as where the appraisement is construed as consisting of separable components, it has been held permissible for a party to challenge one or more of such components, while relying upon the presumption of correctness of all unchallenged elements, when the effect of so doing does not destroy the remainder of the appraisement.

This was the principle established in the cases of *United States* v. *Fritzsche Bros., Inc.*, 35 CCPA 60, C.A.D. 371, and *United States* v. *Schroeder & Tremayne, Inc., et al.*, 41 CCPA 243, C.A.D. 558, and with respect to charges of the kind here involved, this rule was applied in the case of *United States* v. *Dan Brechner & Co.*, 38 Cust. Ct. 719, A.R.D. 71, affirming *Same* v. *Same*, 36 Cust. Ct. 612, Reap. Dec. 8599. It was there held that an appraisement which in effect adopted invoiced ex-factory prices and separately stated additional charges, was severable, and that the question of the addition of the charges could be raised without disturbing the presumptively correct ex-factory prices, or requiring that such prices be established in accordance with the applicable statutory definition of value.

This view has been followed in the cases of *United States* v. *Supreme Merchandise Company*, 48 Cust. Ct. 714, A.R.D. 145; *Haddad & Sons*, v. *United States*, 53 Cust. Ct. 428, Reap. Dec. 10830; *S. H. Kress & Co. et al.* v. *United States*, 45 Cust. Ct. 566, Reap. Dec. 9853; *United States* v. *Gitkin Co.*, 46 Cust. Ct. 788, A.R.D. 132.

Where, however, the appraisement is not separable, then the burden rests with the party challenging it of establishing every material element in the case, and where an export value different from that returned by the appraiser is claimed, it is incumbent upon the plaintiff to show the price at which such or similar merchandise was freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation in the usual wholesale quantities and in the ordinary course of trade. *Valley Knitting Co., Inc., et al.* v. *United States*, 44 Cust. Ct. 599, Reap. Dec. 9627; *Haddad & Sons, Inc.* v. *United States*, 53 Cust. Ct. 423, Reap. Dec. 10825.

Generally speaking, in instances where the appraisement is expressed in terms of an f.o.b. port of exportation value, it is ordinarily not considered to be a separable appraisement and proof of an alternative value in accordance with the statutory definition has been required. The rule is expressed in *S. S. Kresge Co. et al.* v. *United States*, 45 Cust. Ct. 469, Reap. Dec. 9778, as follows:

Unlike the *Brechner* case, the appraisement at bar does not show a first cost or *per se* price to which the inland charges and commission are added. It is a single unit price, f.o.b. net, packed, which, to be sure, by its very statement encompasses such charges, but whether as invoiced, or in some other amount, the return does not reveal. That a mathematical computation might tend to indicate that the appraiser divided the number of square feet of rugs imported into the specified charges and increased the invoice unit values to that extent, does not necessarily suggest that he so acted. It may be coincidence that such results ensue, for it is equally possible that he found the charges excessive and the *per se* values inadequate, and made his computation accordingly. In view of the way the appraised value was expressed, the court may not, without proof, inquire into the methods by which it was ascertained. To challenge the item of the charges under such circumstances, is to bring into question the remainder of the appraisement and to destroy the foundation upon which it is based.

In this case, the presumption of correctness attaches to the total unit values returned by the appraiser. Although he is presumed to have ascertained those values by a proper consideration of every element composing them under the statutory definition, no presumption attaches thereto without more detailed specification. Consequently, his return is not separable into any such components as would invite the application of the *Fritzsche* rule.

Notwithstanding the fact that in the instant case counsel for the plaintiff alleges that the record establishes all of the elements comprising the statutory definition of export value, mainly, a principal market, ordinary course of trade, usual wholesale quantity, and freely offered price, it seems clear that the evidence which was adduced in this case is inadequate for that purpose. Simply because there is no suggestion

in the record that the manufacturer's prices varied with the quantity sold affords no just basis for assuming that the price did not vary with the quantity sold or that proof of usual wholesale quantity was unnecessary. Neither does the fact that the manufacturer sold to various American importers establish that such or similar merchandise was freely sold or offered for sale within the contemplation of that expression, as defined in the law.

Accordingly, this case must stand or fall on the question of whether or not the plaintiff is entitled to rely upon the presumption of correctness of a part of the appraisement while challenging the remainder. In this connection, it is the contention of the plaintiff that the testimony of the examiner that he accepted as correct the charges as enumerated on the invoice; that he determined the proportionate share of such charges which applies to each invoiced item; and that he increased the values, accordingly, serves to create a constructive separation of the appraisement, so that, for all intents and purposes, it is, in fact, an appraisement at first cost, plus charges, and the first costs he accepted need not be proven.

It is the position of counsel for the Government, in view of the principles laid down in the cases of *Muser* v. *Magone*, 155 U.S. 240; *Raylite Trading Co., Inc., et al.* v. *United States*, 37 Cust. Ct. 492, Reap. Dec. 8634, affirmed 38 Cust. Ct. 753, A.R.D. 76, and *Henry Wedemeyer* v. *United States*, 27 Cust. Ct. 449, Reap. Dec. 8051, that it is not permissible to inquire into the method by which the appraiser determined the value of imported merchandise and that, therefore, the testimony regarding the mechanics of the instant appraisement was improperly received.

In the first instance, the court deems it appropriate to observe that the testimony elicited from Examiner Fichtenbaum was not of the objectionable nature discussed in the cases cited by defendant. It was not designed to show the reasons which motivated the examiner nor the considerations which prompted him to recommend the value which the appraiser adopted. Nor was this an inquiry into the mental processes by which he arrived at his conclusion. The testimony educed from this witness seems clearly to have consisted of a discussion of the mechanics of the appraisement, and the court is of opinion that it was proper for the examiner to be questioned about the way in which he computed the value of the subject merchandise. As pointed out by counsel for the plaintiff, there would appear to be very little difference between a concession on the part of the parties that the appraiser adopted the charges as invoiced and proof of this fact by the testimony of the individual who made the calculation.

Actually what the plaintiff is requesting the court to do in this instance is to effectuate a constructive separation of the appraisement

into ex-factory cost and charges subsequently accruing, on the basis of the testimony of the examiner, so that plaintiff may rely upon the presumption of correctness attaching to the ex-factory prices. Seemingly, this is not an unreasonable approach to the question of whether or not inland charges are to be included in the determination of the value of imported merchandise nor does it represent a departure from prior rulings in the matter.

In the case of *United States* v. *Gitkin Co.*, *supra*, which involved some 70 appeals for reappraisement, it appeared that the appraiser in certain instances found a value which was expressed in terms of the invoice unit prices, plus the inland charges, while in others he returned a single unit value, and the parties stipulated that in connection with the values predicated upon f.o.b. prices, the appraiser intended to include charges in at least the amounts shown on the invoices. Under such circumstances, this court stated:

We are of opinion, moreover, that the stipulation of the parties to the effect that the unit value appraisements "include alleged buying commissions, and inland freight, and other charges in at least the amounts as shown in the invoices in such cases," coupled with appellee's acceptance of any resultant advance in the *per se* unit prices, constituted a constructive separation of the elements of the appraisement which permitted appellee to limit its proof to the matter of the disputed charges.

Similarly, in *United States* v. *Supreme Merchandise Company*, *supra*, the court was confronted with 17 appeals for reappraisement. In 14 of them, the appraised values were expressed in terms of the invoice unit values, plus the charges as invoiced. In the remaining three reappraisements, the appraised values were in effect f.o.b. port of exportation prices. As to those three reappraisements, the court, in effect, permitted a constructive separation of the elements of the appraisement and held as follows:

Under the circumstances that the instant record establishes ex-factory sales, and that the appraisement of 14 of the within appeals rests in the first instance upon ex-factory unit prices, we deem the affidavits of the manufacturers (plaintiff's collective exhibits 2 and 3) to be sufficient, for the purposes of this case, to establish ex-factory prices in those appeals in which appraisements were at the equivalent of f.o.b. port of exportation prices.

In view of the fact that the rule of the *Straub* and *Mottola* cases, *supra*, rests initially upon the proposition that charges accruing subsequent to the time when merchandise is packed ready for shipment to the United States are not ordinarily to be included in the export value of merchandise undergoing appraisement, but form a part of that value only when the merchandise is never otherwise offered for sale, it seems proper to adopt a somewhat liberal approach to the consideration of such charges, and where there is any evidence of record tending to show that the appraiser adopted the ex-factory prices and that the merchandise was freely offered for sale at prices

which did not include such charges, it ought to be considered. The burden which a plaintiff in a reappraisement case is required to assume is always onerous. If, without disturbing settled principles of law, the task can be lightened, the court should be inclined to favorable consideration of such an approach. It is the function of the court in these actions to determine the value of imported merchandise, and if there are reasonable ways of achieving that goal, they should be pursued. There can be little doubt in the instant case that the appraiser considered the ex-factory prices to be representative of the prices at which such or similar cotton shirts were freely sold to all purchasers for exportation to the United States, in the usual wholesale quantities and in the ordinary course of trade. And it is reasonable under the circumstances obtaining in this case to allow the plaintiff to rely upon those findings.

The only question which should, therefore, concern the court here is whether or not the record establishes that ex-factory sales were in fact made, and at prices which did not include the questioned charges. Certainly, the positive statements of the witness Yao confirm such sales. While the report of the customs representative tends to show that the financial director of the manufacturer believed that ex-factory sales were never made, and there is indeed some documentary evidence indicating that most of the companies which bought from Smart Shirts Manufacturers, Ltd., did so on an f.o.b. basis, the fact remains that the various contracts between plaintiff and the exporter negotiated for ex-factory transactions. Moreover, the record shows that at least one other importer, Montgomery Ward, not only purchased on an ex-factory basis, but actually paid on its own behalf, through its representative in Hong Kong, all charges accruing subsequent to the time its merchandise left the seller's factory.

The court considers it significant that none of the subexhibits in defendant's collective exhibit A refers to Montgomery Ward sales. And while a Treasury representative's report possesses evidentiary value, it is, nevertheless, an unverified statement, which, without documentary support or other substantiation, is ordinarily not entitled to as great weight as positive sworn testimony. *W. Stuart Smith* v. *United States*, 23 Cust. Ct. 20, C.D. 1182; *United States* v. *Supreme Merchandise Company, supra.*

The court deems the evidence in the instant case sufficient to establish that such or similar merchandise as that here involved was freely sold to all purchasers at ex-factory prices and that the charges subsequently accruing form no part of the export value thereof. The court, therefore, makes the following findings of fact:

1. The merchandise involved in the instant appeal for reappraisement consists of men's cotton dress and sport shirts exported from Hong Kong on or about May 26, 1963.

2. Said merchandise was invoiced and entered at ex-factory unit prices.

3. Said merchandise was appraised at values equivalent to f.o.b. port of exportation prices.

4. The appraisement was made on the basis of export value, as such value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.

5. The record establishes that the ex-factory prices and charges, as invoiced, were considered by the appraiser to be correct, and that a proportionate part of the charges as invoiced was added to the invoice unit values to arrive at the appraised values.

6. The record establishes that, at or about the time of exportation, such or similar merchandise was freely sold for exportation to the United States on an ex-factory basis.

The court, therefore, concludes:

1. That export value, as that value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis for the determination of the value of the merchandise covered by this appeal for reappraisement.

2. That under the circumstances under which the appraiser accepted charges as invoiced, the appraisement is deemed to be separable, and the invoiced unit prices are, therefore, clothed with a presumption of correctness.

3. That the invoice unit price, exclusive of any charges over and above the said price, is the export value for each of the items of merchandise herein involved.

Judgment will be entered accordingly.