(A.R.D. 206)

Tapetes Luxor, S.A., et al. v. United States

Entry No. 1128, etc.

## Second Division, Appellate Term

(Decided March 30, 1966)

*Leon Herzfeld* and *Sharretts, Paley & Carter* (*Eugene F. Blauvelt* and *Gail I. Cumins* of counsel) for the appellants.

*John W. Douglas*, Assistant Attorney General (*Morris Braverman*, trial attorney), for the appellee.

Before RAO and FORD, Judges

RAO, Chief Judge: This is an application for review of a decision and judgment sustaining the appraised values of certain imported handmade wool hooked rugs (*Tapetes Luxor, S.A., et al.* v. *United States*, 53 Cust. Ct. 504, Reap. Dec. 10866). Involved herein are 19 appeals for reappraisement, consolidated for purposes of trial, which relate to merchandise exported from Mexico during the period between July 26, 1956, and February 27, 1959. In all of said cases except reappraisement R59/8198, the importer of record was the manufacturer and seller, appellant above named, Tapetes Luxor, S.A., and the rugs were invoiced and entered at unit values per square meter which allegedly reflected f.o.b. Texcoco, Mexico, prices. Reappraisement R59/8198 covers several importations in the name of El Bordador S. de R. L. (hereinafter referred to as "El Bordador"), also a manufacturer and shipper, which, though invoiced at f.o.b. Laredo, Tex., unit prices, less 10 percent discount, were likewise entered at f.o.b. Texcoco prices per square meter.

The appraiser invoked the cost of production provisions of section 402(f) of the Tariff Act of 1930 as the basis of his valuation of the rugs exported prior to February 27, 1958, and the export value provisions of section 402(b) of said tariff act, as amended by the Customs Simplification Act of 1956, for his determination of the values of the rugs exported subsequent to said date. The result in all instances was an amount equivalent to f.o.b. Texcoco prices per square meter, plus 5 percent.

It is the 5 percent increase over the entered values which is the point of contention between the parties in this case; appellants otherwise concede both that the respective bases of appraisement adopted by the appraiser were proper and that the *per se* unit values thereby computed were correct.

The statutory provisions here involved read as follows:

Section 402 (f) of the Tariff Act of 1930—
SEC. 402. VALUE.

\*　　\*　　\*　　\*　　\*　　\*　　\*

(f)  COST OF PRODUCTION.—For the purpose of this title the cost of production of imported merchandise shall be the sum of—

(1)  The cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing such or similar merchandise, at a time preceding the date of exportation of the particular merchandise under consideration which would ordinarily permit the manufacture or production of the particular merchandise under consideration in the usual course of business;

(2)  The usual general expenses (not less than 10 per centum of such cost) in the case of such or similar merchandise;

(3)  The cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the particular merchandise under consideration in condition, packed ready for shipment to the United States; and

(4)  An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraphs (1) and (2) of this subdivision) equal to the profit which ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the production or manufacture of merchandise of the same class or kind.

Section 402 (b) of said tariff act, as amended, *supra*—

(b)  EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

It appears from the record and by acknowledgment of the parties that the disputed item represents a commission paid to the Mexican firm of Export Shipping Office, S.A., which is shown to be the shipper of the subject rugs.  Here, as in the court below, it is contended by appellants that said commission represents a charge for handling the exportation of the merchandise which the purchasers were required to pay if they availed themselves of that service, but which, being optional, formed no part of the value of the rugs regardless of the basis of value employed.

Generally speaking, appellee urges that the commission was a charge for a function normally performed by or for the account of the seller

of merchandise; that it constituted part of the operating expenses of a business and, therefore, should properly be considered either as overhead or as profit, and apparently these were the factors which prompted the appraiser to include the 5 percent charge as part of the cost of production or of the export value, as the case may be, of the instant merchandise. As stated by the appraiser during the course of the trial:

* * * I would say that one of the points that we had discussions on was that 5 per cent commission, which we didn't consider—we considered it to be part of the value, was treated as overhead, or profit. We didn't believe that the 5 per cent should be charged extra if it was a bona fide service of the company to their customers. It is the usual thing for shippers to prepare shipping documents, consular invoices, etc., and this company was charging for that extra, so we thought we believed and it was substantiated by the reports, that that was part of the operating expenses of the corporation.

The circumstances surrounding the sale and exportation of the merchandise at bar were detailed at length in a voluminous record consisting of the testimony of four witnesses called on behalf of appellants, two on behalf of appellee, and a mass of documentary evidence introduced by both parties, all of which the court has carefully considered. It appears therefrom that appellant El Bordador was a Mexican corporation engaged in the business of manufacturing wool rugs and carpets for sale, both for home consumption in Mexico and for exportation to the United States. Its principal stockholder was one Maurice Salle who was also the principal stockholder and president of Tapetes Luxor, S.A. (hereinafter referred to as "Tapetes Luxor"), a company which succeeded El Bordador and absorbed its assets and liabilities. In or about September 1956, Mr. Salle also acquired control of a defunct forwarding agency which thereafter resumed doing business under the name of Export Shipping Office, S.A. (hereinafter referred to as "Export Shipping").

According to the proof introduced by appellants, although these three corporations were in effect under common ownership and, apparently to some extent, under common management, and, in fact, cooperated in the conduct of their respective businesses, they were, nevertheless, separate corporate entities whose operations were neither interrelated nor interdependent in a legal sense. El Bordador and subsequently Tapetes Luxor were engaged in the production of rugs and carpets in a factory complex situated in the town of Texcoco, Mexico, some 27 miles distant from Mexico City. They also maintained an office in Mexico City in the building occupied by Export Shipping for the conduct of its own freight forwarding business. Seemingly, owing to the uncertainties of rural deliveries, all mail for

the manufacturing companies was channeled through their Mexico City office.

A typical export transaction, as described by the plant manager of Tapetes Luxor who served in that capacity during the period covered by the shipments at bar, as well as by an employee of the export department of that company, involved the following steps: Orders received at the Mexico City office were daily transmitted to the plant at Texcoco where production orders, referred to as "order control sheets," were written up in quadruplicate. One copy was sent to the purchaser, one to Export Shipping, and one to the factory. When the carpets were finished, they were stenciled with the name and address of the customer, packed in bales or bundles, and a packing list giving the details of the contents of each package, an invoice showing prices per meter f.o.b. Texcoco, Mexico, in Mexican currency and in United States dollars, and a notice to Export Shipping indicating that the carpet was ready for shipment were prepared. The carpets and accompanying documents were sent to Export Shipping in Mexico City which thereafter handled their transshipment to the United States and arranged for entry and payment of duties, usually at the port of Laredo. Once the merchandise was turned over to Export Shipping, the manufacturer had no further connection with it unless there were complaints about quality or delivery dates, or the like, although, since title to the goods did not pass to the American purchaser until all of the details connected with entry into the United States were completed, the manufacturer, either El Bordador or Tapetes Luxor, was named as nominal consignee and importer of record.

In selling their carpeting to United States customers, El Bordador and Tapetes Luxor selected individuals in various sections of the country to act as their exclusive agents in the ultimate disposition of their products. Generally these agents negotiated for the sale of the rugs, arranged to forward the orders and details with respect thereto to the manufacturer, and, at or about the time of payment, received a commission based upon the f.o.b. price.

As indicated by plaintiffs' exhibit 2, which was stated to consist of all of the documents involved in a typical shipment to a United States customer during the period here relevant, Export Shipping sent a notice to the ultimate purchaser about the time when the merchandise was ready for delivery to the United States. The purchaser was advised that Export Shipping had paid, or expected to pay, insurance charges, freight from Mexico City, Mexican customs broker's charges, and United States customs duties and brokerage charges. A full statement of the expenses incurred or to be incurred by Export Shipping was included in a so-called "debit note," which set forth

the amounts due to the manufacturer, as per the manufacturer's invoice, the amounts advanced for transportation, insurance, and customs duties, and the 5 percent commission charged by Export Shipping for its services calculated on the basis of the manufacturer's initial invoice, which latter document was also included in the notification. A copy of some, if not all of these papers, including the "debit note," was normally forwarded to the agent in the area through whom the sale had been made. Customarily the American agent's commission was remitted after the ultimate purchaser paid all charges on the shipment. Usually the customer made payment for the total amount shown on the so-called "debit note" forwarded by Export Shipping. Sometimes his check was sent to Export Shipping, sometimes to the seller, but in all cases it was deposited by and for the account of Export Shipping which then paid the seller the amount of its original invoice.

Apparently, as the result of a series of conferences with the appraiser and other customs officials at the port of Laredo and with several of the customers of the manufacturers, a letter, dated August 8, 1955, the body of which reads as follows, was forwarded to all of the customers of El Bordador:

GENTLEMEN:

In order to explain to you fully our method of operation under the new system of selling and shipping the merchandise directly to you or to your customers, we wish to be entirely fair and leave you at liberty to purchase the goods from us under any one of the two systems described below:

1.  FOB Laredo, Texas, as per prices on the attached price list which have been submitted to you. The prices are net, with all expenses and duties paid by us on Mexican and American Customs.

2.  FOB Texcoco, Mexico, as per prices on the other attached price list. This means that we sell you the merchandise here and you take care of all the expenses from Texcoco to the border and then to final destination. Those expenses mean transportation, insurance, consular fees, customs broker on both sides of the border, U.S. import duty at 40% ad-valorem and 5% to the forwarding agent. At the present time, we are using the services of Export Shipping Office, S.R.L., our agent who charges us 5% on the value of the F.O.B. Texcoco price, which corresponds aproximately [sic] to 3.3% on the F.O.B. Laredo, Tex. landed cost.

We would be glad to sell you under any of the two systems, but we believe that we should leave the decision to your choice. As you will understand, it is easier to us to sell you the goods F.O.B. Texcoco, Mex. and turn the merchandise to the forwarding agent that you may choose to handle the shipments for you, since we do not make any profit on the forwarding or handling of the shipments.

Please be kind enough to give us an answer regarding this matter and oblige.

Very truly yours

EL BORDADOR, S. de R. L.

Rene Enriquez

JN/jr

Evidently it was much more convenient for the American purchasers to accept the f.o.b Laredo prices than to make separate arrangements with a freight forwarder to handle the merchandise on their behalf, and all of the shipments here involved were forwarded upon that basis. Occasionally, however, where there had been a delay in shipment or it was necessary to expedite delivery, a customer would request shipment by air freight, in which case it appears that the carpeting was turned over to the air carrier without incurring the freight forwarder's fee.

Some of the customers of El Bordador and Tapetes Luxor indicated in affidavits submitted on behalf of appellants that they understood perfectly that they could purchase f.o.b. Texcoco, Mexico, as well as f.o.b. Laredo, Tex., and specifically requested Tapetes Luxor to arrange with Export Shipping to act on their behalf. It is evident, however, from a comparison between the affidavit executed by Louis E. Sugarman, president of Decorative Carpets, Inc., of Los Angeles, Calif., on January 22, 1962 (plaintiffs' exhibit 5), and the contradictory sworn statement which he furnished to Customs Agent Vernon V. Hann on January 10, 1963 (defendant's exhibit 0), that the American customers of appellants did not fully appreciate the nature and consequences of their transactions with the manufacturers, and they had no interest in the mechanics of the shipments so long as they were able to calculate an f.o.b. Laredo price per yard.

For the reason that there was no evidence of actual sales f.o.b. Texcoco and because of the relationship which was shown to exist amongst the three corporations hereinabove alluded to, the trial court rejected the contention of appellants that the 5 percent charge made by Export Shipping was not a part of the value of the merchandise here under consideration. The trial judge was of opinion that this charge was for services of a kind which are usually performed by a manufacturer of merchandise sold for exportation to the United States and should, therefore, be included in the value of such merchandise. In the case of the rugs appraised on the basis of cost of production, the court held that said charges formed part of the general expenses of the seller. In the case of the rugs appraised on the basis of export value, the court held that offers for sale at ex-factory prices could not be considered as representative of such value in view

of the fact that actual sales were made, and since there was no evidence of sales at other than f.o.b. prices, the charge in question was properly included in the export value of this merchandise.

The cases of *United States* v. *Alfred Dunhill of London, Inc.*, 32 CCPA 187, C.A.D. 305; *C. J. Tower & Sons* v. *United States*, 44 Cust. Ct. 532, Reap. Dec. 9579; reversed on other grounds *United States* v. *C. J. Tower & Sons*, 48 Cust. Ct. 683, A.R.D. 139; reversed and remanded *C. J. Tower & Sons* v. *United States*, 50 CCPA 76, C.A.D. 824; decided on remand *United States* v. *C. J. Tower & Sons*, 52 Cust. Ct. 636, A.R.D. 172, and *A. N. Deringer, Inc., et al.* v. *United States;* 51 Cust. Ct. 475, Reap. Dec. 10634, were cited in support of the proposition that expenses connected with the sale of exported merchandise were properly a part of the overhead or usual general expenses to be included in the cost of production of exported merchandise.

In concluding that export value, under section 402(b), *supra*, was properly computed with the addition of the 5 percent commission, the trial court considered the principles in the cases of *United States* v. *Paul A. Straub & Co., Inc.*, 41 CCPA 209, C.A.D. 553; *Albert Mottola, etc.* v. *United States*, 46 CCPA 17, C.A.D. 689; *Delmonico International Corp.* v. *United States*, 52 Cust. Ct. 656, A.R.D. 176; *Daniel F. Young, Inc., et al.* v. *United States*, 40 Cust. Ct. 860, Reap. Dec. 9173, appeal dismissed 42 Cust. Ct. 770, A.R.D. 107; *Batten & Co.* v. *United States*, 5 Ct. Cust. Appls. 447, T.D. 34975; *United States* v. *Herrman et al.*, 91 Fed. 116; and *United States* v. *Kurt Orban Company, Incorporated*, 51 Cust. Ct. 537, A.R.D. 163; to the effect that, where merchandise is sold at prices which include certain disputed charges and is never sold in any other way, the charges are part of the value of the merchandise.

In both instances, the trial court's holding that the expenses of shipping the subject merchandise to the United States and arranging for entry and the payment of duty formed part of the value of this merchandise rested upon the initial determination that the affairs of Export Shipping were so affiliated and intertwined with El Bordador and/or Tapetes Luxor that the former was, in fact, performing functions which either or both of those corporations would otherwise have undertaken.

Clearly where a seller assumes the task of shipping goods to an American purchaser, f.o.b. American port, duty paid, the value of services performed by the seller in the execution of that agreement would be part of his general expenses, which, it is to be expected, would be reflected in the price charged for his goods and in the value thereof, and this is the tenor of the cases cited and relied upon by the trial court. But not every seller engages in the practice of arranging for the shipment of his goods to the United States. Whether

from choice, or owing to lack of facilities therefor, or for reasons known only to themselves, many foreign manufacturers prefer to offer their merchandise for sale ex-factory, and the burden and responsibility of carting the goods away fall upon the purchaser. And if sales are made ex-factory and a *bona fide* arrangement is entered into with a freight forwarder for the shipment of the merchandise to the United States, it does not necessarily follow that the forwarder's fee for handling the shipment is a part of the seller's expenses. Here it seems clear that the manufacturers presented alternative methods of purchasing which afforded an option to the customer to accept delivery f.o.b. Laredo or to arrange to purchase f.o.b. Texcoco. There is little doubt that had these purchases involved a separate and independent agreement between the purchaser and Export Shipping for the forwarding of the carpets to the United States that the 5 percent commission would have represented a charge for a service performed on behalf of the purchaser similar in nature to a *bona fide* buying commission which, under settled law, forms no part of the value of imported merchandise. *Stein* v. *United States*, 1 Ct. Cust. Appls. 36, T.D. 31007; *United States* v. *Bauer et al.*, 3 Ct. Cust. Appls. 343, T.D. 32627; *United States* v. *Case & Co., Inc.*, 13 Ct. Cust. Appls. 122, T.D 40958; *United States* v. *Nelson Bead Co.*, 42 CCPA 175, C.A.D. 590, affirming *Same* v. *Same*, 31 Cust. Ct. 481, A.R.D. 36.

The question arises whether, because of the relationship between the manufacturers and Export Shipping, their activities were so completely intertwined as to make suspect the designation of the latter as the intermediary of the purchasers for the transportation of the subject merchandise from Mexico City to Laredo, Tex.

Under the interpretation provided by our appellate tribunal in *United States* v. *Kurt Orban Company, Incorporated, supra*, the relationship between the seller and the forwarding agent is not necessarily a determinative criterion of whether or not goods are offered for sale at an ex-factory unit price which does not include charges subsequently accruing. In the cited case, it appears that the issue was one involving the question of whether inland freight and other f.o.b. charges were properly a part of the export value of certain wire products manufactured in France. It appears that an agency, familiarly known by the name of SAPET, located in Paris, was the exclusive representative of some six French manufacturers of wire products and that it was, in fact, owned by the principal mills for which it acted as export sales agent. SAPET also arranged for purchases from other mills. Sales and offers to sell wire and other products were made by SAPET in Paris, subject to final acceptance by the manufacturer at the factory. When merchandise was ready for

shipment, the manufacturer prepared a bill showing a price ex-factory. This was forwarded to SAPET where a second invoice was prepared. It included the manufacturer's statement, plus an additional amount for inland freight and f.o.b. charges. The amount stated for inland freight was generally an estimate and not the actual freight charges incurred. It further appeared that the buyer assumed all risks from the time of shipment from the factory, and insurance of the merchandise in favor and at the expense of the purchaser ran from the time the merchandise left the factory. The buyer paid the total invoice charge to SAPET which, in turn, remitted the ex-factory price to the manufacturer.

The trial court held that the ex-factory prices, exclusive of any additional charges, represented statutory export value, and implicit in that conclusion was a holding that the factories of the sellers were the principal markets in which such merchandise was bought and sold.

In reversing the trial court, the appellate division reached a contrary result as to the site of the principal market. The court was of opinion that the principal market was the place where the merchandise was sold and offered for sale, which, in this instance, was Paris, the place where the office of SAPET was located. Under those circumstances, the court held that the price in Paris, which included the arbitrary addition of freight and the f.o.b. charges, represented the export value of the wire products under consideration.

In reinstating the judgment of the trial court, the Court of Customs and Patent Appeals found that there was substantial evidence to support the conclusion that the merchandise could be purchased at a price which did not include the inland freight charges, and that, whether or not SAPET was the exclusive export agent of the manufacturers, the services which it performed in connection with the shipment of the merchandise to the United States were solely for the convenience of the purchaser.

We are of the opinion that the analogy with the instant case is clear. So long as it cannot be disputed that the purchasers of the subject wool carpets had the option of buying at f.o.b. Texcoco prices, and it is our opinion that the notice which was sent to the customers of El Bordador and Tapetes Luxor amply substantiates the existence of that option, it must be considered that Export Shipping was acting in behalf of the purchaser regardless of whether or not Export Shipping was a wholly owned subsidiary of the manufacturers. It does not follow that, because expenses of delivery are normally borne by a manufacturer of goods exported to the United States, they are necessarily a part of the manufacturer's overhead in every instance. If it can be shown that a manufacturer offers his customers the choice of purchasing on an ex-factory basis, then expenses incurred in for-

warding the purchased merchandise to the United States, including the freight forwarder's fee for services, cannot be considered to be a part of the manufacturer's cost of producing his goods.

With respect to those shipments exported from Mexico subsequent to February 27, 1958, the trial court made the following observations:

In the instant case, the only sales of which evidence was presented were at f.o.b. Laredo prices which included the 5 percent commission. The sales that were mentioned as being at f.o.b. Texcoco prices with delivery by air freight appear also to have included this commission. In fact, there is no evidence of any actual purchases, whether f.o.b. Laredo or not, which did not include the 5 percent commission. The record is not sufficient to establish that the merchandise could have been purchased without payment of the 5 percent. The commission was an integral part of the purchase price in the principal market at or prior to the time of shipment. It did not accrue subsequent to shipment. Whether or not the merchandise was freely offered for sale at ex-factory prices is doubtful; in any event, since there were sales, offers may not be considered under the language of section 402(b), *supra*. The commission was clearly not a buying commission and the weight of the evidence establishes that Export Shipping was not retained by the purchasers to act for them. In most cases they had no knowledge of its existence. Therefore, it cannot be said that it was their agent and that the services rendered by it were for their account. The services were rendered for the account of the seller, for whom the shipment was made and entered at Laredo and who offered the merchandise at a price which included the commission. Under these circumstances, the commission is an integral part of the purchase price and was properly included by the appraiser as a part of the export value of the merchandise.

It must be remembered in the instant case, however, that all of the importations here involved were appraised on the basis of f.o.b. Texcoco prices and that the appellants are herein challenging only that portion of the appraisement which adds to those prices the 5 percent commission charged by Export Shipping.

Under the principles first enunciated in the case of *United States* v. *Fritzsche Bros., Inc.*, 35 CCPA 60, C.A.D. 371, and consistently followed in *United States* v. *Schroeder & Tremayne, Inc., et al.*, 41 CCPA 243, C.A.D. 558; *Dan Brechner et al.* v. *United States*, 36 Cust. Ct. 612, Reap. Dec. 8599, affirmed *United States* v. *Dan Brechner et al.*, 38 Cust. Ct. 719, A.R.D. 71; *United States* v. *Supreme Merchandise Co.*, 48 Cust. Ct. 714, A.R.D. 145; and *United States* v. *Gitkin Co.*, 46 Cust. Ct. 788, A.R.D. 132, such an appraisement is deemed to be separable, and a party challenging the additional charge may rely upon the presumption of correctness inherent in the appraiser's return with respect to all other unchallenged items.

The presumption flowing from the appraiser's finding of f.o.b. Texcoco prices in the present instance assumes that such or similar mer-

chandise was freely sold or, in the absence of sales, offered for sale in Texcoco, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States at the invoice unit prices. We are not, therefore, here concerned with the question of whether or not sales were made which comport with the new statutory definition of export value or whether it is proper to consider offers for sale in lieu of actual sales in the determination of such value. These are elements which are implicit in the appraisement and have not been challenged by appellants. What concerns us here is the same question which confronted our appellate court in the *Straub* and *Mottola* cases, *supra*, and has been presented to this court in numerous cases since, namely, when inland freight and other charges form part of the value of imported merchandise. *Dan Brechner et al.* v. *United States, supra,* affirmed *United States* v. *Dan Brechner et al., supra; United States* v. *Supreme Merchandise Co., supra; Haddad & Sons, Inc.* v. *United States,* 53 Cust. Ct. 428, Reap. Dec. 10830; *Valley Knitting Co., Inc., et al.* v. *United States,* 44 Cust. Ct. 599, Reap. Dec. 9627; *United States* v. *Gitkin Co., supra.*

It may now be declared to be settled law that charges accruing subsequent to the time when merchandise leaves the principal market are part of the statutory value of such merchandise only when it is established that such or similar merchandise could not be purchased at prices which do not include such charges. Where, however, there is evidence to show that the merchandise can be bought at the factory, or in the principal market if that is located elsewhere than at the factory, at unit prices which do not include such charges, they are not to be considered as part of the value of the merchandise. Export value is defined as the price in the principal market at which such or similar merchandise is freely sold or offered for sale. It includes all expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States. If that price is one which does not embrace expenses to be incurred for subsequent transactions, then those expenses are not added to the price for the purpose of determining statutory value.

As this court had occasion to observe in the case of *Bud Berman Sportswear, Inc.* v. *United States,* 55 Cust. Ct. 574, Reap. Dec. 11056, since the inclusion of inland freight and other charges incurred in connection with the exportation of merchandise from a foreign country constitutes a departure from the general rule that such charges do not ordinarily form part of export value, a somewhat lenient attitude is warranted in the determination of when conditions exist which require a finding that there is no other price but the one which embraces such charges.

While it is true that the prices paid by all of the purchasers of the merchandise here involved were f.o.b. Laredo duty paid prices, it

seems obvious that sales on that basis are not such sales as conform to the statutory definition of export value. They include elements such as customs brokerage fees and United States customs duty which have never been considered to be a part of the value of exported merchandise. *Cf. John A. Steer & Co.* v. *United States*, 30 Cust. Ct. 504, Reap. Dec. 8196, cited with approval in *United States* v. *Paul A. Straub & Co., Inc.*, 41 CCPA 209, C.A.D. 553. Accordingly, such sales must be disregarded as there is, in contemplation of law, an absence of sales possessing the characteristics requisite to spell out the value defined in the statute. *Aceto Chemical Co., Inc.* v. *United States*, 51 CCPA 121, C.A.D. 846.

Indeed it is questionable in the instant case whether sales were, in fact, made on an f.o.b. Laredo basis. It has been affirmatively established that in every instance the manufacturer's invoice showing prices f.o.b. Texcoco was included in the documents enumerated in the "debit note" and forwarded to the purchaser. And, moreover, the appraisement at unit prices reflective of the manufacturer's invoice unit prices ex-Texcoco presumes either that sales were made ex-Texcoco or, if they were not, that offers were made on that basis. In either event, a price exclusive of the freight forwarder's fee was presumptively available, and it is, therefore, proper to consider whether or not the instant record contains proof that an option to purchase ex-Texcoco existed.

In the respects hereinabove outlined, the instant case is distinguishable from our recent decision in *Louis Goldey Co., Inc.* v. *United States*, 55 Cust. Ct. 759, A.R.D. 196, wherein actual sales consistent with the statutory definition of export value were proven, and, accordingly, offers for sale were held to be irrelevant.

As has already been indicated, the court is of opinion that an option was, in fact, available at all times covered by the shipments here involved to anyone who cared to purchase the products of El Bordador or Tapetes Luxor. Accordingly, it is our view that the services performed by Export Shipping were in effect an accommodation to the buyer which could, if it chose, make other arrangements for the shipment of its purchases. As such, the cost of those services which did not inure to the benefit of the manufacturer was not a part of the price at which the merchandise was sold to all purchasers. It was, therefore, improperly added by the appraiser in the ascertainment of the export value of the instant merchandise.

At this point, it seems appropriate to remark that the trial court's conclusion to the contrary was predicated in part upon the decision of the third division of this court in the *Kurt Orban* case, *supra*, which held that an agent selected by the manufacturer to prepare export documents and arrange for the exportation of purchased goods

was performing services in behalf of the manufacturer. That view was rejected by the Court of Customs and Patent Appeals when the issue was presented to it, and the consequences stemming from that court's reversal would tend to support the conclusion here reached that the charges for services rendered by Export Shipping were not part of either the stautory cost of production or export value of the instant merchandise.

Predicated upon the foregoing considerations, this court finds the following facts:

1. The merchandise involved herein consists of handmade wool hooked rugs exported from Mexico between July 26, 1956, and February 27, 1959.

2. The merchandise which was exported prior to February 27, 1958, was appraised on the basis of cost of production, as that value is defined in section 402(f) of the Tariff Act of 1930.

3. The merchandise which was exported on or after February 27, 1958, was appraised on the basis of export value, as that value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.

4. The appraisements in all shipments were at amounts equivalent to the f.o.b. Texcoco, Mexico, unit prices per meter, plus a 5 percent commission or charge made by a forwarding agent.

5. The only question which has been raised in this case is the propriety of the addition of the 5 percent to the ex-Texcoco, Mexico, prices.

6. The merchandise was manufactured by El Bordador or Tapetes Luxor in Texcoco, Mexico, and was shipped by the manufacturer to Export Shipping in Mexico City for transshipment to the United States.

7. The manufacturers offered the merchandise for sale to United States customers through sales agents who were furnished two price-lists, one showing prices f.o.b. Texcoco and the other showing prices f.o.b. Laredo.

8. All sales made during the period here involved were at f.o.b. Laredo prices, which included the 5 percent commission paid to Export Shipping.

9. At all the times herein involved, any United States customer for the merchandise produced by either El Bordador or Tapetes Luxor could have purchased his merchandise at f.o.b. Texcoco prices with the option to designate Export Shipping or any other freight forwarder to handle the transportation of the merchandise from Texcoco, Mexico, to the United States.

10. Although El Bordador and Tapetes Luxor were under common ownership and, to a certain extent, under common management

with Export Shipping, and a very close relationship existed amongst the three companies, there was, nevertheless, no obligation on the part of a purchaser of the carpets and rugs manufactured by El Bordador or Tapetes Luxor to retain the services of Export Shipping for the transportation of any rugs or carpets bought by him, and sales f.o.b. Laredo, with all transportation charges, insurance, and duties advanced by Export Shipping, were solely for the accommodation and convenience of the purchasers.

The court, therefore, concludes:

1. That cost of production, as the value is defined in section 402(f) of the Tariff Act of 1930, is the proper basis of appraisement for the wool rugs here involved which were exported from Mexico prior to February 27, 1958.

2. That export value, as that value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis of appraisement for such wool rugs as were exported from Mexico on and after February 27, 1958.

3. That a 5 percent commission paid to a freight forwarder for expenses incurred in transshipment of the subject merchandise from Mexico City to the United States was not an expense incidental to placing the merchandise in issue in condition, packed ready for shipment to the United States, and, therefore, was not an element of either cost of production or export value as the case may be.

4. That cost of production of the merchandise exported prior to February 27, 1958, and export value of the merchandise exported on and after February 27, 1958, are represented by the appraised values, less the addition of 5 percent.

5. That the judgment of the trial court be, and the same hereby is, reversed.

Judgment will be entered accordingly.