UNITED STATES *v.* TAPETES LUXOR S.A. ET AL. (No. 5255)*

*C.A.D. 921.

United States Court of Customs and Patent Appeals, June 2, 1967

*Barefoot Sanders*, Assistant Attorney General, *Andrew P. Vance*, Chief, Customs Section, *Morris Braverman* for United States.

*Sharretts, Paley & Carter* (*Eugene F. Blauvelt, Gail T. Cumins*, of counsel) for appellees.

[Oral argument April 5, 1967 by Mr. Braverman and Mr. Blauvelt]

Before WORLEY, Chief Judge, RICH, SMITH, and ALMOND, Associate Judges.

WORLEY, Chief Judge, delivered the opinion of the court:

 This appeal is from the judgment of the Second Division of the Customs Court, 56 Cust. Ct. 797, A.R.D. 206, reversing the judgment of the trial judge in 19 consolidated appeals for reappraisement.

The merchandise is handmade wool rugs exported from Mexico between July 26, 1956, and February 27, 1959. The manufacturer and seller, El Bordador S. de R.L. in one appeal and Tapetes Luxor, S.A. in the others, is the importer of record in each case, and the rugs were entered at unit prices per square meter which allegedly reflected f.o.b. Texcoco, Mexico, prices.

The appraiser based his evaluation of those rugs exported prior to February 27, 1958, on cost of production under Section 402(f) of the Tariff Act of 1930, and of those rugs exported subsequent to that date on export value under Section 402(b) of said tariff act, as amended by the Customs Simplification Act of 1956 (91 T.D. 295). In all instances the appraised values were equivalent to the f.o.b. Texcoco prices per square meter plus 5 percent.

In dispute is whether the 5 percent addition was properly included in evaluating the merchandise, neither party contesting that the respective bases of appraisement adopted by the appraiser were proper. The trial court sustained the appraiser's addition of 5 percent, but the Appellate Division reversed that judgment.

The statutory provisions involved are:

Section 402(f) of the Tariff Act of 1930—

SEC. 402. VALUE.

 \* \* \* \* \* \* \*

(f) COST OF PRODUCTION.—For the purpose of this title the cost of production of imported merchandise shall be the sum of—

 (1) The cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing such or similar merchan-

dise, at a time preceding the date of exportation of the particular merchandise under consideration which would ordinarily permit the manufacture of production of the particular merchandise under consideration in the usual course of business;

(2) The usual general expenses (not less than 10 per centum of such cost) in the case of such or similar merchandise;

(3) The cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the particular merchandise under consideration in condition, packed ready for shipment to the United States; and

(4) An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraphs (1) and (2) of this subdivision) equal to the profit which ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the production or manufacture of merchandise of the same class or kind.

Section 402(b) of said tariff act, amended, supra.

(b) EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

It appears that El Bordador was a Mexican corporation manufacturing wool rugs for sale both for home consumption and export to the United States. Its principal stockholder was one Maurice Salle, who was also the principal stockholder of Tapetes Luxor, which succeeded El Bordador and absorbed its assets and liabilities. Also involved and controlled by Mr. Salle is Export Shipping Company.

According to the evidence, a typical exporting transaction involved the following steps: Orders were received in an office of Tapetes Luxor in Mexico City and transmitted to its plant in Texcoco where production orders were prepared in quadruplicate. One copy was sent to the purchaser, one to Export Shipping and one to the factory. When finished, the rugs were stenciled with the name and address of the customer and packed in bales or bundles. Also prepared were a packing list giving the contents of each package, an invoice showing prices per square meter f.o.b. Texcoco, Mexico, in Mexican currency and in United States dollars, and a notice to Export Shipping that the rugs were ready for shipment. The rugs and documents were sent to Export Shipping in Mexico City. Export Shipping then sent a notice to the ultimate purchaser advising him that it had paid, or expected to pay, insurance charges, freight from Mexico City, Mexican custom's broker's charges and United States customs duties and brokerage charges.

It also sent to the purchaser a "debit note" setting forth the amount due the manufacturer, the aforesaid charges incurred by Export Shipping, and a 5 percent commission charged by Export Shipping for its services, the latter being calculated on the basis of the manufacturer's original invoice. The customer's check in payment of the "debit note" amount was deposited for the account of Export Shipping, which paid the manufacturer the amount of its invoice, irrespective of whether the check was sent to the manufacturer or to Export Shipping. Ordinarily, the commission of the American agent who sold the goods to the ultimate purchaser was remitted after said purchaser had paid all charges on the shipment.

Prior to the present exportations, El Bordador forwarded a letter dated August 8, 1955, to its customers, the body of which read:

Gentlemen:

In order to explain to you fully our method of operation under the new system of selling and shipping the merchandise directly to you or to your customers, we wish to be entirely fair and leave you at liberty to purchase the goods from us under any one of the two systems described below:

1. FOB Laredo, Texas, as per prices on the attached price list which have been submitted to you. The prices are net, with all expenses and duties paid by us on Mexican and American Customs.

2. FOB Texcoco, Mexico, as per prices on the other attached price list. This means that we sell you the merchandise here and you take care of all the expenses from Texcoco to the border and then to final destination. Those expenses mean transportation, insurance, consular fees, customs broker on both sides of the border, U.S. import duty at 40% ad-valorem and 5% to the forwarding agent. At the present time, we are using the services of Export Shipping Office, S.R.L., our agent who charges us 5% on the value of the F.O.B. Texcoco price, which corresponds approximately to 3.3% on the F.O.B. Laredo, Tex. landed cost.

We would be glad to sell you under any of the two systems, but we believe that we should leave the decision to your choice. As you will understand, it is easier to us to sell you the goods F.O.B. Texcoco, Mex. and turn the merchandise to the forwarding agent that you may choose to handle the shipments for you, since we do not make any profit on the forwarding or handling of the shipments.

All of the shipments here involved were forwarded on the basis of f.o.b. Laredo prices. Occasionally, a customer would request shipment from Mexico by air freight, but the evidence is not completely clear as to what role Export Shipping may have played in such cases.

The Appellate Division found that the notice regarding alternative methods of arranging purchases amply substantiates the conclusion that the purchasers of the imported rugs had the option of buying at f.o.b. Texcoco prices as well as f.o.b. Laredo, and held that it must be considered that Export Shipping was acting on behalf of the purchasers "regardless of whether or not Export Shipping was a wholly owned subsidiary of the manufacturers." The Appellate Division fur-

ther observed that all of the importations were appraised on the basis of f.o.b. Texcoco prices and that the importers are challenging only that portion of the appraisement which adds to those prices the 5 percent commission charged by Export Shipping. It held that such an appraisement is deemed to be separable and that a party challenging only the additional charge may rely upon the presumption of correctness inherent in the appraiser's return with respect to all other unchallenged items.

With respect to the rugs appraised on cost of production, the Appellate Division concluded that the forwarding fee of Export Shipping was not part of the manufacturer's cost of producing its goods. As to the goods subsequently exported and appraised at export value, the Appellate Division held that the services were, in effect, an accommodation available to the buyer at his option and that the costs were not properly part of the export price.

Our review in reappraisement appeals being limited to matters of law, the issue here is whether the Appelalte Division erred in applying the law, and whether there is substantial evidence to support its findings of fact.

The evidence of record includes testimony of four witnesses called by the importer and two by the government, together with documentary evidence introduced by both parties.

The government relies on the close ties and cooperation between the manufacturers and Export Shipping as an indication that the latter "was treated as, if not actually in fact, a department of the manufacturers." It also asserts that the preponderance of the evidence establishes that the American customers did not retain Export Shipping as their agent and were not advised that rugs could be purchased from Tapetes Luxor without payment of the 5 percent commission. According to the government, the evidence "leads only to the conclusion that Export Shipping acted only for and on behalf of the manufacturers."

However, as observed by the Appellate Division, the relationship between the seller and the forwarding agent is not necessarily determinative of whether goods are offered for sale at an ex-factory unit price which does not include charges subsequently accruing. *Kurt Orban Co., Inc.* v. *United States*, 52 CCPA 20, C.A.D. 851. Neither do we consider that relationship as necessarily determinative of whether a commission paid to such forwarding agent is a part of the general expenses of the manufacturer when a cost of production appraisement is involved. In both instances the question must be determined on the evidence at hand as was done by the Appellate Division.

There is substantial evidence to support the conclusion that the United States customers could have purchased the merchandise at

f.o.b. Texcoco prices with the option to designate Export Shipping or some other freight forwarder to handle the transportation from Texcoco to the United States. The letters of El Bordador offering the goods at such terms as an alternative to f.o.b. Laredo prices is significant in that respect. Also supporting that conclusion are the affidavits of some customers, submitted on behalf of the importers, asserting that they understood that they could purchase f.o.b. Texcoco. It is true there are other circumstances that tend to indicate that some customers may not have been informed of the option available to them and that a manufacturer's agent in the United States received commissions based on a percentage of the f.o.b. Laredo price. However, it is not in our province to weigh those circumstances against the substantial evidence supporting the finding below. See *United States* v. *North American Asbestos Corp.*, 48 CCPA 153, C.A.D. 783.

Moreover, the manufacturer's invoice showing f.o.b. Texcoco prices was included in the documents enumerated in the "debit note" and forwarded to the customers. Also, it must be remembered that all of the importations were appraised on f.o.b. Texcoco prices and that the importers are challenging only the addition thereto of the 5 percent commission charged by Export Shipping. In the case of the goods appraised at export value, the action of the appraiser indicates a finding on his part that such or similar merchandise was freely sold or, in the absence of sales, offered for sale, in Texcoco in accordance with the provisions of Section 402(b).

There being no basis for disturbing the factual conclusion that United States customers could have purchased the goods f.o.b. at Texcoco at the corresponding prices, it is apparent that the 5 percent commission paid to Export Shipping was not a part of either a statutory cost of production or the export value of the imported merchandise.

Since we find no reversible error, the judgment is *affirmed*.